**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael L. JOHNSON, Defendant–
Appellant.**

No. 90–6235.

United States Court of Appeals,
Tenth Circuit.

Aug. 15, 1991.

Robert E. Mydans (Timothy D. Leonard, U.S. Atty. and Barbara E. Poarch, Sp. Asst. U.S. Atty., on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Susan M. Otto, Asst. Federal Public Defender (William P. Earley, Asst. Federal Public Defender, on the brief), Oklahoma City, Okl., for defendant-appellant.

Before BRORBY and EBEL, Circuit Judges, and KANE,* Senior District Judge.

BRORBY, Circuit Judge.

Michael L. Johnson (hereinafter Defendant) appeals his conviction and sentence for mail fraud and equity skimming. One issue in this appeal concerns whether the prosecution (hereinafter Government) vio-

lated Defendant's Fifth Amendment rights because the Government excluded potential jurors who, like Defendant, are African–American ("black"). The remaining arguments in this appeal take exception to the federal district court's application of the federal Sentencing Guidelines.

Before addressing the legal issues, a brief and generalized summary of the case is desirable.

## I

Defendant wanted to become a prosperous businessman by acquiring income-producing real estate. In early 1988, Defendant responded to a newspaper advertisement listing for sale various residential properties owned and rented out to tenants by Baer Realty.[1] After several meetings with Baer representatives, Defendant purchased eighteen homes in Oklahoma.[2] The homes all carried mortgages held by a single mortgage company, and were insured against default by the United States Department of Housing and Urban Development.

Baer Realty agreed to sell its homes to Defendant after verifying he was steadily employed and had no unfavorable credit history. Baer also required a business plan from Defendant, outlining how he would manage the properties. Defendant knew before purchasing that the properties were losing money. Although Defendant at one time discussed converting the homes into properties for federally subsidized low-income tenants, he apparently never took any action on this idea.

The terms by which Defendant purchased the homes were generous, and reflected his desire to buy only properties where he could legally just assume the loan from Baer and take title. Defendant paid no money up front and did not pay the closing costs. Given these terms, Defen-

---

* The Honorable John L. Kane, Jr., Senior United States District Judge for the District of Colorado, sitting by designation.

1. Baer Realty is a real estate brokerage firm and property management company with offices in New Mexico and Oklahoma. It operates under various names, but is referred to in this opinion only as Baer Realty.

2. The parties agree Defendant purchased eighteen homes, although the briefs only specifically list eleven properties.

dant bought over $400,000 worth of property with no money down even though his income as a State of Oklahoma employee was only $1,200 per month. At the closing, Defendant also received a check covering the security deposits on each of the properties.

After acquiring the homes, Defendant notified all the tenants to start mailing their rent checks to him. Some did, although others simply stopped paying. There was testimony at trial explaining that when Defendant received rent, he got it through the mail from tenants who mailed their checks to him.

Defendant never made a single mortgage payment on any of the properties, even though he collected a total of over $16,000 in rent from the tenants who continued to pay. Defendant put less than $2,000 into work on the properties. As for the rest of the money, Defendant apparently spent some of it to pay off an approximately $4,000 loan stemming from a failed concert promotion deal. He spent other rent money on clothing, jewelry, and furniture for himself even though his rental income was the only money he had to meet the mortgage payments he was legally required to make.

Defendant defaulted on all of the properties and the lending institution foreclosed. Defendant was convicted of ten counts of mail fraud, and one count of equity skimming and sentenced to thirty months imprisonment on each count, to be served concurrently. Defendant was also fined $5,000, plus an additional $550 special assessment. *See* 18 U.S.C. § 1341 (mail fraud statute); 12 U.S.C. § 1709–2 (equity skimming statute). Having reviewed the background, we now turn to the matters on appeal.

## II

Defendant's first issue concerns the racial makeup of the jury that convicted him.

Defendant is black, and because the Government used peremptory challenges to exclude the only two blacks who were in the final pool, or petit venire, from which Defendant's jury was selected, Defendant alleges he was denied his implicit Fifth Amendment right to equal protection under the law.[3] He argues the Government's attempt to show a race-neutral reason for excluding the two black individuals from the jury venire is "insufficient," and further argues the record does not support the district court's ruling for the Government on this matter. He concludes "the prosecution removed those jurors solely on the basis of race and denied him equal protection and trial by a jury of his peers." We must decide whether Defendant's arguments have merit.

## A

During the jury selection process, two prospective jurors who are black were called. In response to the trial court's inquiry concerning employment, the first potential black juror told the court she was a legal secretary who worked on fraud cases. The record reveals the following discussion concerning the potential juror's employment:

[THE COURT:] Has anyone or anyone close to you had any personal experience in the past with a mail fraud or with an instance of at least alleged manipulation of mortgages? Well, I—

JUROR HALL: Well, on my job. I['m] working for [a] housing attorney and, of course, the biggest case is just started about the utilities, I'm involved in that because I work—I'm secretary for one of the attorneys of Legal Aid.

THE COURT: Yes, and Legal Aid of Western Oklahoma, right? So you probably sit there and read and type and

---

3. *See, e.g., Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 2080, 114 L.Ed.2d 660 (1991) (recognizing equal protection component of the Fifth Amendment's Due Process Clause applies in federal civil suits when a party uses peremptory challenges to exclude potential jurors on account of race). *See also Washing-* *ton v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (equal protection component of Fifth Amendment Due Process Clause applies to the federal government); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

discuss a great many related instances like this, is that correct?

JUROR HALL: Yes.

THE COURT: Would that, Mrs. Hall, have any effect on your ability to sit here as an objective and detached juror?

JUROR HALL: I don't think so, it's not the same set of circumstances. I haven't had anything to do with the mortgage skimming or anything like that.

THE COURT: All right. And of course, if you are selected as a juror in this case, Mrs. Hall, I'll instruct you that you can't go back to your office and ask your boss there at the Legal Aid of Western Oklahoma whether the Judge's instructions are correct or incorrect.

JUROR HALL: No, sir.

The only other potential black juror called to the venire panel revealed she had a relative who had been convicted of a criminal offense. The record reveals the following discussion with respect to the criminal conviction:

[THE COURT:] .... Well, I'm not prodding or prying but must ask, because this is a criminal case, the question whether you or anyone close to you has ever been convicted of a criminal offense, other than a traffic-type violation? Minor infraction.

Mrs. Crain?

JUROR CRAIN: Yes, I have a brother that was convicted of a criminal offense.

THE COURT: How long ago, ma'am?

JUROR CRAIN: Eight years.

THE COURT: And I'm sure this was very distressing for everybody in the family, but would that predispose you in favor of one side or another here?

JUROR CRAIN: No.

THE COURT: Do you think you would be just as objective and detached as if that experience had not occurred in your family?

JUROR CRAIN: Yes.

THE COURT: Thank you....

Following more questioning, the attorneys exercised their peremptory challenges. The Government used two of its six peremptories to strike the two black persons from the final jury. The trial judge realized the Government's action raised an equal protection question and called both sides to the bench for a conference. During this conference the judge prompted the Defendant's lawyer to make an objection and then allowed the Government to respond before ruling:

THE COURT: Mr. Earley, have you any observation to make concerning the implication of the challenges of Hall and Crain?

MR. EARLEY: Yes, Your Honor. I would request the Government to state on the record the purpose for removing them.

MRS. POARCH: I'm sorry, I can't hear.

MR. EARLEY: I would request the Government to state on the record the purpose for removing Mrs. Hall and Miss Crain, the only two black jurors who were called on this panel.

MRS. POARCH: As to—you'll have to refresh my memory on the names, as to Mrs. Hall.

THE COURT: Hall was the legal secretary.

MRS. POARCH: Hall was the legal secretary working for Legal Aid, the Government's position with her association in a law practice, that she may already have some predisposition about either procedural aspects of the case or legal aspects of the case just by virtue of her experience in a law office.

As to Miss Crain, on the front row, the Government's concern, of course, is having a close relative that was convicted of a serious felony, that that would be extremely difficult. I know she expressed that she would be capable of setting that aside but the Government feels that it would be extremely difficult to in fact set that aside and not be biased against the Government in the bringing of a criminal case, criminal charge.

MR. EARLEY: Your Honor, I believe her responses to your question about whether or not she could be fair and impartial were in the affirmative, and

she didn't show any hesitation in that respect. So if the Government's feelings were that strong, I would assume they would have challenged her for cause.

THE COURT: Anything to say about Miss Hall, the legal secretary?

MR. EARLEY: I believe that she also stated affirmatively that nothing about her occupation or work would have any effect upon her, and that her dealings with matters that are even closely related to this sort of activity were simply, I'll just define it, clerical, and would not have any bearing on her decision in this case.

THE COURT: I'm not so sure everybody understands *[B]atson,* I don't in all its ramifications, but I think it's clear under *[B]atson* that the Government doesn't have to state anything that would be so strong as a basis for a challenge for cause. If there were that kind of basis, it would have been a challenge for cause and we wouldn't be talking about p[er]emptory challenges but, rather, the obligation that the Government has to come up with some articulable, objective explanation for the challenge that would be a reasonable explanation without regard to the race of the juror who was challenged. In Miss Hall's case, of course, we haven't any evidentiary presentation to this effect but we all know that Legal Aid of Western Oklahoma is, it is a thoroughly worthwhile organization that delivers legal services to indigent people, and her occupation is in the—for the Housing Attorney there; so that, it seems to me, would be ample base for a p[er]emptory challenge without regard to the race.

And with respect to Juror Crain, my recollection is that the Juror Phillips likewise had a brother who was convicted of a drug offense, and he was also challenged. And I think it's objectively reasonable in a criminal case that somebody who's had such event occur in the immediate family would be a less suitable juror, so I will accept the panel as it is.

MR. EARLEY: May my objection be noted on the record.

THE COURT: It just was.

### B

■ The Supreme Court, in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), forged the modern Constitutional test for determining whether a jury is selected in a race-neutral manner. Borrowing from the proof model used in Title VII disparate treatment cases, the Court fashioned a process where the burden of producing evidence shifts at appropriate points from a defendant to the state. *Id.* at 94 n. 18, 106 S.Ct. at 1721 n. 18. First, to establish a prima facie case of discrimination:

> (1) the defendant must show he is a member of a cognizable racial group, and that the prosecution has exercised peremptory challenges to remove members of a particular race from the venire; (2) the defendant is entitled to rely on the fact that peremptory challenges are a jury selection practice which permits discrimination by those who wish to discriminate; and (3) the defendant must show that these facts and other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire members from the petit jury on account of their race.

*United States v. Esparsen,* 930 F.2d 1461, 1465 (10th Cir.1991) (footnote omitted) (citing *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722–23), *petition for cert. filed* 7/15/91 —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d —— (S.Ct. No. 5163).

■ The shift in production of evidence occurs in the next step after the defendant establishes a prima facie case. Although a defendant always carries the ultimate burden of persuasion, 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation" for the peremptory challenge. *Id.* at 97, 106 S.Ct. at 1723. Finally, after the trial court receives the state's explanation, it then has "the duty to determine if the defendant has established purposeful discrimination." *Id.* (footnote omitted).

Recently the Supreme Court clarified how an appeals court must scrutinize a trial court's implementation of *Batson*. *See Hernandez v. New York*, —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). At the outset, the first issue of whether a prima facie case of discrimination exists becomes moot whenever the prosecutor offers a race-neutral explanation for his peremptory challenges and the trial court rules on the ultimate factual issue of whether the prosecutor intentionally discriminated. *Id.* 111 S.Ct. at 1866. As for our review, we analyze the prosecutor's explanation for his actions as a legal issue, while we review only for clear error the trial court's ultimate factual ruling on whether the prosecutor intentionally discriminated. *Hernandez*, 111 S.Ct. at 1865–66.

As mentioned, the legal question we focus upon is the prosecutor's explanation which comes after the defendant establishes a prima facie case. "In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause *as a matter of law*." *Id.* at 1866 (emphasis added). "At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (emphasis added). Moreover, the disparate impact of a prosecutor's actions cannot, standing alone, establish an equal protection violation. *Id.* at 1867.

Finally, we review the trial judge's ultimate decision on whether the Defendant proved discrimination by the prosecution. Because "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal," *id.* at 1868, we review the trial court's ultimate ruling only for clear error. According to the Court:

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985), citing *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984).

*Id.* at 1869. *See, e.g., Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21 (a finding of intentional discrimination is a finding of fact entitled to appropriate deference on appeal) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Also, the fact this is a criminal appeal does not change our standard of review on the issue before us. When addressing an issue other than the accused's guilt or innocence, the clearly erroneous standard of review applies to appellate review of trial court fact findings. *Hernandez*, 111 S.Ct. at 1866; *Maine v. Taylor*, 477 U.S. 131, 145, 106 S.Ct. 2440, 2450, 91 L.Ed.2d 110 (1986). Having set forth the standard of review, we turn to the merits of this case.

### C

Because the Government offered a race-neutral explanation for its peremptory challenge of the two black jurors, and because the trial court ruled on the ultimate question of intentional discrimination, the preliminary issue of whether Defendant actually made a prima facie showing of discrimination is now moot. *Hernandez*, 111 S.Ct. at 1866. *See also United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987) ("[A]ppellate review should not become bogged down on the question of whether the defendant made a *prima facie* showing in cases where the district court has required an explanation."). *But see Esparsen*, 930 F.2d at 1466 (cautioning that when a defendant attempts to show discrimina-

tion, the burden of creating an appropriate factual record is on the defendant).

■ We now address the facial validity of the prosecutor's explanation for striking the two black jurors, and decide whether the explanation was race neutral. We need not pause long to consider this point since even a cursory review of the record reveals the racial neutrality of the explanation. In this case, the Government peremptorily struck one black juror from the venire because she was a "legal secretary working for Legal Aid." The prosecutor explained she feared this potential juror was predisposed because of her Legal Aid job. The other possible black juror was stricken because her brother was once convicted of a crime, and the prosecutor felt her family history would bias the juror against the Government's criminal case.[4] We hold these reasons are facially valid and do not violate equal protection as a matter of law because no discriminatory intent is inherent in the prosecutor's explanation. The prosecutor's remarks do not indicate she acted "because of," rather than "in spite of" race. *Hernandez*, 111 S.Ct. at 1866. Also, the fact the prosecutor's criteria meant the only two prospective black jurors did not serve on Defendant's jury does not mean her actions are a per se Equal Protection violation. *Id.* at 1867.

■ Finally, proceeding to the trial judge's ultimate ruling, we do not conclude it is clearly erroneous. The trial judge, who was in the best position to observe the demeanor and credibility of the Government attorney exercising the peremptory challenges, believed her explanation. In his ruling, the judge remarked there was "ample bas[is]" for removing a juror who worked for Legal Aid. As for the other juror whose brother had a criminal conviction, the judge declared "it's objectively reasonable in a criminal case that somebody who's had such [an] event occur in the immediate family would be a less suitable

juror." Furthermore, another, apparently non-minority juror who "had a brother who was convicted of a drug offense" was also removed from the venire by the prosecutor and the judge noted and evidently considered this fact before ruling for the Government.

We are not the first federal appeals court to consider the constitutionality of peremptory challenges based on employment or on family members with criminal records. In *United States v. Johnson*, 905 F.2d 222 (8th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 304, 112 L.Ed.2d 257 (1990), "[t]he prosecutor explained that he peremptorily had struck two black venirepersons, as he had struck a white venireperson, because of their employment with the Division of Family Services, based on the belief they would be sympathetic to Johnson's defense." *Id.* at 222. The court of appeals wrote the record supported the prosecutor's race-neutral explanation. *Id.* at 223. Similarly, in *United States v. Nicholson*, 885 F.2d 481 (8th Cir.1989), the court accepted the race-neutral reason for peremptorily challenging a juror who "had a relative who was incarcerated." *Id.* at 483. *Nicholson*, like the case before us, involved mail fraud. However, unlike the instant case, the prosecutor's explanation in *Nicholson* for removing certain black jurors was given only after the court of appeals remanded for an explanation and for an initial ruling by the district court. On remand, the prosecutor recalled the fact that one juror had an incarcerated relative. *Id.* With the record finally developed, the appeals court concluded the prosecutor's explanation was acceptable and affirmed the conviction. *Id.* It said the district court did not clearly err in holding the Government's peremptory challenges were exercised in a constitutionally permissible manner. *Id.*

After reviewing the record in this case, where the Government's explanation and

---

**4.** The prosecutor stated the juror's brother was convicted of a "serious felony." This comment does not square with the record made available to us. When she was questioned by the judge, all the potential juror said was her brother had been convicted of a "criminal offense." The juror did not specify whether her brother's conviction was a felony or a misdemeanor. Nevertheless, the Government's explanation it was peremptorily striking the juror because a close relative was once convicted of a crime is still a valid race-neutral reason.

district court ruling were promptly made at trial, we are not left with a definite and firm conviction a mistake was committed. *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511; *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Accordingly, we hold the district court's ruling is not clearly erroneous and the Government's peremptory challenges were exercised in a constitutionally permissible manner. *See also United States v. Hughes,* 911 F.2d 113, 114 (8th Cir.1990) (peremptory challenge of a black juror because a family member had a felony conviction is permissible); *United States v. Jackson,* 914 F.2d 1050, 1052 (8th Cir.1990) (peremptory challenge of black juror whose nephew was incarcerated upheld); *Forbes,* 816 F.2d at 1010 (not clearly erroneous to peremptorily remove a black juror "whose two sons had been in trouble with the law").

### III

Having found no constitutional error in the makeup of Defendant's jury, we are required to consider his remaining arguments concerning his sentence. Defendant claims he is entitled to be resentenced because the district court incorrectly applied the federal Sentencing Guidelines ("the Guidelines") in his sentencing. Only two specific Guidelines contentions raised by Defendant require discussion.

### A

██ Defendant claims it was improper for the district court to count a deferred sentence he received from an Oklahoma state court in scoring his criminal history. To address this argument we are required to examine Oklahoma's deferred sentencing law, as well as the Guidelines. We

begin by reviewing how Defendant's sentence was determined.

Defendant was given one criminal history point for passing a bogus check for $104 in 1980 when he was twenty-three years old. Defendant received a two year deferred sentence from the Oklahoma County District Court, and was also ordered to pay restitution. According to the Presentence Report, Defendant "successfully completed the terms of probation and on March 4, 1982, the case was dismissed." However, the bogus-check charge was still counted in assessing Defendant's criminal history because his Oklahoma criminal record contained "no evidence that the record was officially expunged." By counting this charge with another unrelated bogus-check charge, Defendant received a total of two criminal history points and was placed in Criminal History Category II. *See* United States Sentencing Commission, *Guidelines Manual,* ch. 5, Sentencing Table (Nov. 1990) (hereinafter U.S.S.G.). If the deferred sentence had been ignored, Defendant would have received only one criminal history point and would have been in Criminal History Category I. A defendant in Criminal History Category I is eligible for a lighter sentence than a defendant in Criminal History Category II.[5]

Defendant takes the position it is not necessary under Oklahoma law to have a state criminal record "officially expunged." He contends a criminal record in Oklahoma is automatically expunged by "operation of law" after a successful probation. In support of this argument, Defendant points to Oklahoma's law governing court procedures for deferred judgments, which reads, in pertinent part:

> Upon completion of the probation term ... the defendant *shall be discharged* without a court judgment of guilt, and the verdict or plea of guilty or plea of

---

5. Defendant in this case was sentenced to 30 months, which is the maximum amount of time permitted by the Guidelines for his Offense Level and Criminal History Category.

Defendant's Offense Level is 16. (R, Vol. II, Presentence Report at ¶¶ 21, 25.) A defendant with an Offense Level of 16 and a Criminal History Category of II may be imprisoned for 24–30 months. However, a defendant with an

Offense Level of 16 and a Criminal History Category of I may only be imprisoned for 21–27 months. U.S.S.G. ch. 5, Sentencing Table. For a brief and simplified explanation of how the Guidelines work, see *United States v. Williams,* 922 F.2d 578, 579 n. 1. (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 733 (1991).

nolo contendere *shall be expunged from the record* and said charge *shall be dismissed* with prejudice to any further action.

Okla.Stat.Ann. tit. 22, § 991c (West 1986) (emphasis added).

While the Government admits Oklahoma's deferred sentencing statute leaves "much to be desired in terms of the expungement procedure," it nevertheless contends it is clear from the statute that expunction does not automatically occur by operation of law upon dismissal of a case. Reading the statute as Defendant suggests would, according to the Government, be "absurd" in light of Oklahoma's public policy of preserving and maintaining public records. *See* Okla.Stat.Ann. tit. 74, §§ 150.12, 150.7 (West 1987). The Government also quotes the district judge, who said:

> I am in agreement with the view that in order to obtain the benefit of expunction a Defendant must present some actual evidence of expunction and can't just say to the Court, "Well the time has passed and nothing happened." There's no way, really, for a verification of that except to run around to the counties in Oklahoma, and indeed outside the state, and track down records. Which is an undue burden on the probation office when, really, it's a simple matter for a Defendant to present his evidence on that point.

■ The construction of Oklahoma's deferred sentencing statute is a question of law, *United States v. Louisiana–Pacific Corp.*, 754 F.2d 1445, 1447 (9th Cir.1985), which we are required to review de novo without deference to the district court sitting in Oklahoma. *Salve Regina College v. Russell,* — U.S. ——, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991). De novo review means we make an independent determination of the issues. *United States v. Irvin*, 906 F.2d 1424, 1426 (10th Cir.1990). In this case, we undertake the task of construing Oklahoma law out of necessity. The correctness of Defendant's federal sentence must be ascertained. Since the Guidelines specify expunged convictions are *not*

counted in calculating criminal history, U.S.S.G. § 4A1.2(j), we must determine if the bogus-check charge is expunged, or whether it should be treated as expunged under Oklahoma law. *Cf. United States v. Cox*, 934 F.2d 1114 (10th Cir.1991) (federal appeals court considering whether a defendant's California conviction had been set aside examined California law and then applied its determination in considering the validity of defendant's federal sentence).

■ The word expunge generally means the physical destruction of information. *Dubnoff v. Goldstein*, 385 F.2d 717, 724 (2d Cir.1967) With respect to criminal records, expunction refers to the process of sealing or destroying the record of a criminal conviction after expiration of a certain time. *Black's Law Dictionary* at 522 (5th ed. 1979). *See generally* Annotation, *Judicial Expunction of Criminal Record of Convicted Adult*, 11 A.L.R.4th 956 (1982).

The key question here is whether Oklahoma's deferred sentencing law automatically expunges a criminal record upon successful completion of probation, or whether an individual must take some affirmative action after probation to have their record expunged. We believe the statute operates automatically. We reach this conclusion after examining the statute itself, Oklahoma cases construing the statute, and other pertinent material.

As already mentioned, Oklahoma's deferred sentencing statute states that upon completion of probation a criminal record "*shall* be expunged." Okla.Stat.Ann. tit. 22, § 991c (West 1986) (emphasis added). "In the construction of statutes, 'shall' is usually given its common meaning of 'must.' It is interpreted as implying a command or mandate." *Sneed v. Sneed*, 585 P.2d 1363, 1364 (Okla.1978) (footnote omitted). It is highly significant when a legislature chooses the word "shall" because it implies a command or mandate. *Woolen v. Coffman*, 676 P.2d 1375, 1377 (Okla.Crim. App.1984). Shall is not a permissive word. *Lenion v. State*, 763 P.2d 381, 382 (Okla. Crim.App.1988).

We realize, of course, the word "shall" does not necessarily mean "is," and there-

fore the deferred sentencing statute could be read to require some action by a defendant seeking to have a criminal record expunged. However, this construction of the statute would clearly be at odds with Oklahoma's expressed policy in § 991c of allowing defendants to expunge their criminal records after probation. Section 991c contains no mechanism an individual must follow to have a record expunged. Nor does it refer to any other statute setting out a formal expunction procedure. All the law commands is that the record "shall be expunged." Okla.Stat.Ann. tit. 22, § 991c (West 1986). Reading the statute in context, the implication that it operates automatically is strong. To read the law otherwise would place obstacles in an individual's path that Oklahoma's Legislature did not intend to erect. In addition, we observe that Oklahoma's criminal appeals court acknowledges the statute's mandatory nature. In *State v. Rodriquez*, 547 P.2d 974, 975 (Okla.Crim.App.1976), the court referred to the provisions of § 991c as "mandatory provisions." Likewise, in *State ex rel. Hicks v. Freeman*, 795 P.2d 110 (Okla.Crim.App.1990), the court wrote "§ 991c *clearly authorizes* the expunction of a 'verdict or plea of guilty or plea of nolo contendere.'" *Id.* at 112 (emphasis added). This construction of the statute is echoed by one commentator who calls it mandatory and observes a defendant is not required to petition a court in order for the statute to work. Note, *Criminal Procedure: Expunction—Fact or Fiction?*, 31 Okla.L.Rev. 978, 992 (1978).

"The fundamental rule of statutory construction is to ascertain and give effect to the intention of the legislature as expressed in the statute." *Freeman*, 795 P.2d at 112. *Accord Hess v. Excise Bd. of McCurtain County*, 698 P.2d 930, 932 (Okla.1985). Following this fundamental rule, we hold the expunction provisions of Oklahoma's deferred sentencing statute operate automatically and the Defendant in this case was not required to follow some unknown and unspecified procedure to have his prior criminal record expunged after he successfully completed probation for his Oklahoma deferred sentence. In so

holding, we reject the Government's public policy argument, which contends other Oklahoma statutes override the expunction statute.

The first statute the Government points to in its argument is inapposite as it deals only with the transmission of fingerprint arrest records on persons who may be wanted in other jurisdictions. Okla.Stat. Ann. tit. 74, § 150.12 (West 1987). The second statute concerns only general reports and records of the Oklahoma State Bureau of Investigation and requires those reports to be kept for ten years. Okla. Stat.Ann. tit. 74, § 150.7 (West 1987). This second statute also says nothing about court conviction or probation records. To read it in the broad fashion the Government advances would overwhelm the plainly expressed policy contained in the phrase "shall be expunged." *See* Okla.Stat.Ann. tit. 22, § 991c (West 1986). Moreover, when Oklahoma's Attorney General interpreted an aspect of the expunction statute, he too remarked how the word "shall" usually means "must." *See* Okla. Att'y Gen.Op. No. 83-48 (1984). Our construction of the expunction statute is therefore entirely consistent with the interpretation rendered by Oklahoma's courts and executive officers. Indeed, the Government prosecutor here candidly admitted during Defendant's sentencing that individuals in Oklahoma are often led to believe they need do nothing to have their criminal records expunged after probation. Her comments came as she was expressing personal misgivings about counting Defendant's deferred sentence as part of his criminal history. The prosecutor stated:

> I'll be real candid with the Court and say that from a personal standpoint I have some difficulty with this area of the guidelines as far as deferred sentence. Having practiced in State Court in the District Attorney's Office, I know that often the Defendants are led to believe that at the conclusion of that successful period of a deferred sentence that in fact that slate is wiped clean. So in honesty, I'm bothered somewhat by this.

The trial judge likewise expressed misgivings about counting Defendant's deferred sentence, but ruled for the Government because he did not feel federal probation officers should be required to "run around to the counties in Oklahoma" to track down records. However, Defendant's presentence report reveals that probation officers already obtained all background information about Defendant before calculating his criminal history. For example, Defendant's presentence report indicates the Oklahoma deferred check charge was filed in Oklahoma County District Court, and it further identifies the case by its state file number. The report notes Defendant was represented in the Oklahoma courts by counsel and successfully served a two year deferred sentence beginning on March 5, 1980, and ending March 4, 1982. The report even states the bogus-check amount and names the party it was written to. As for Defendant's deferred sentence, the report says the state file contained no evidence the record was "officially expunged." Given all this information, it is plain that federal probation officers dutifully researched Defendant's background, and could easily have known if his deferred sentence was revoked.[6] Thus, we feel the trial judge's comments—while commendably expressing concern for the workload of federal probation officers—are nevertheless overstated. Also, the fact that probation officers obtained information about Defendant's probation does not mean Defendant's record was not expunged, or should not be treated as expunged. Oklahoma, like other states, may implement its expunction law by sealing records from the general public while preserving them for statistics and law enforcement personnel, including probation officers. See, e.g., State v. Zawistowski, 339 So.2d 315, 316 (Fla.Dist.Ct.App.1976). Even if Oklahoma does not follow this policy, the rule of lenity requires us to interpret criminal laws so as not to increase the penalty placed on an individual. "[I]n case of doubt concerning the severity of the penalty prescribed by a statute, construction will favor a milder penalty over a harsher one." N. Singer, *Sutherland Stat. Const.*, § 59.03 at 12 (4th ed. 1986). *See also Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (the policy of lenity means courts do not interpret criminal statutes so as to increase penalties). Since Oklahoma has no controlling statute or ruling requiring an individual to petition for expunction, we construe Oklahoma's expunction law as it is presently written in Defendant's favor.

## B

■ Defendant was charged and convicted of mail fraud and equity skimming. The presentence report said the loss suffered by the Government because of Defendant's activities was over $551,000. Applying the Guidelines, the presentence report added eight points to Defendant's offense level due to the significant loss. U.S.S.G. § 2F1.1(b)(1)(I).

Defendant, however, contends the Government did not suffer the loss stated in the presentence report. Defendant argues the Government lost only the rent money Defendant collected while he owned the real estate. Defendant believes the gist of his convictions are for obtaining the rent monies and not the real estate. He therefore says the district court erred in sentencing him based on the real estate's value.

In response, the Government argues Defendant was convicted for obtaining both money and real estate by means of false and fraudulent pretenses, representations and promises. Thus, the government argues the district court properly included the value of the real estate in arriving at Defendant's Guidelines sentence.

We believe Defendant's mail fraud conviction covers his activities in acquiring the real estate, as well as the rent monies. We reach this conclusion after reviewing the indictment. The indictment charges Defen-

---

**6.** In fact, the prosecutor realized Defendant was not entitled to expunction on his second Oklahoma bogus-check charge. The second bogus-check charge was discussed in the presentence report without any indication that expunction applied to it.

dant with a scheme to "make false and fraudulent representations to the seller of the properties and mortgage companies in order to fraudulently induce the seller to transfer his property to the defendant." The indictment further charges Defendant with scheming to collect rent from his tenants until "the tenants were notified of impending foreclosure or were evicted by the mortgage company or financial institution." Because the indictment clearly indicates Defendant was being held accountable for both acquiring the real estate and rent monies, we reject Defendant's argument insofar as it implies he was convicted only for acquiring the rent checks. We now proceed to consider Defendant's argument as it relates to his sentencing by the district court.

During sentencing the district court commented it was proper to consider the real estate's value in arriving at Defendant's sentence. The district judge felt this way because "[i]t's inconceivable that a person with the financial circumstances of the Defendant could have entered into the transactions that he did without foreknowledge that they were economically doomed and that foreclosures would ensue, casting this great loss upon the Government." It is plain from this comment the district judge intended to punish Defendant for the loss he caused the Government.

Our concern in reviewing Defendant's sentence is with the meaning of the term "loss." In construing the term loss we are deciding whether the district court correctly computed the loss attributable to Defendant's criminal activities. *United States v. Whitehead,* 912 F.2d 448, 451 (10th Cir. 1990).

Consideration of this matter is aided by the Guidelines' commentary on the meaning of the term loss. The relevant commentary states:

> 'Loss' means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the

particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.

U.S.S.G. § 2B1.1 comment. (n. 2).

█ We believe the real estate was "taken" within the meaning of the term "loss" as it is used in the Guidelines. *See* U.S.S.G. § 2B1.1 comment. (n. 2). The Government's reacquisition of the real estate through foreclosure does not change the fact that the Defendant took the real estate in the first place. For example, in a case involving the loss of a vehicle, we held "the amount taken was the entire vehicle and its contents." *United States v. Westmoreland,* 911 F.2d 398, 399 (10th Cir. 1990). In *Westmoreland,* we noted "[t]he fact that good police work diminished the actual loss to the ... victim should not affect the determination of the extent of defendant's culpability and responsibility for purposes of sentencing." *Id.* The same is true here. The fact the Government was able to reacquire the properties does not diminish Defendant's culpability and responsibility for the fraudulent scheme he masterminded. We hold the district court committed no error in construing the term loss. The district court permissibly decided to base Defendant's sentence on the value of all the property taken, including the value of the real estate and cash.

█ The preceding holding does not, however, end the problem. The Guidelines say property value is defined by its fair market value. U.S.S.G. § 2B1.1 comment. (n. 2). We cannot tell from the presentence report or sentencing transcript if the figures used to arrive at Defendant's offense level is the real estate's fair market value. At one point the presentence report indicates the Government lost over $551,000.[7] However, the presentence report further notes the real estate was insured for over $700,000. We do not know which figure is

---

**7.** In their briefs on appeal the parties agree the real estate's value is around $400,000. The presentence report figure estimating the Govern-

ment's loss at $551,000 considers other activities by Defendant that also cost the Government money.

the real estate's correct fair market value, or even if both figures are inaccurate regarding the fair market value. On remand the district court should make factual findings that will reveal the fair market value of the real estate. The court may then properly set Defendant's offense level by combining the real estate's fair market value with the cash amount the Government lost to determine the Government's total loss.

If the district court decides the final figure is "inadequate to measure [the] harm to the victim," then the court is free to "measure the loss in some other way, such as reasonable replacement cost to the victim." U.S.S.G. § 2B1.1, comment. (n. 2). Of course, if the court elects to use an alternative measurement, it should make an appropriate record with sufficient detail so that appellate review will be facilitated.

### C

Defendant's remaining Guidelines complaints allege the district court erred when it (1) ruled Defendant engaged in more than "minimal planning" in committing his crimes; and (2) erred in determining Defendant accepted no responsibility for his actions. We carefully reviewed Defendant's remaining contentions and believe they are meritless and warrant no discussion.

### IV

In conclusion, the Government did not violate Defendant's constitutional right to equal protection when it peremptorily struck two black jurors from Defendant's jury. The district court's judgment of conviction is therefore AFFIRMED. However, because there were errors in sentencing, the case is REMANDED to the district court with instructions to vacate Defendant's sentence and then to immediately resentence him in accordance with the views expressed in this opinion.

Conviction AFFIRMED; REMANDED for resentencing.