974 F.2d 1339
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Arlie LAWSON, Defendant-Appellant.
 Nos. 91-6296, 91-6297.
 United States Court of Appeals, Sixth Circuit.
 Aug. 25, 1992.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and COOK, Chief District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Arlie Lawson appeals his conviction and sentence for unlawfully transporting and receiving explosives in interstate commerce, transporting stolen coal in interstate commerce, failure to file coal production statements, and conspiracy to commit the foregoing offenses and others. On appeal, the issues are: (1) whether there is sufficient evidence to sustain the convictions on Counts 1, 5, 6, and 8; (2) whether the government failed to provide defendant with certain materials that were allegedly exculpatory; (3) whether the district court's calculation of the damage to the property from which the coal was removed was a correct determination of "loss" under United States Sentencing Guideline § 2B1.1; and (4) whether the district court erred in refusing to give defendant's requested instruction concerning the course of a state boundary dispute case involving the property in question. For the reasons that follow, we affirm.
 
 I.
 
 2
 Defendant Arlie Lawson lived in a trailer on Mud Creek Road in Whitley County, Kentucky, and sporadically mined coal on the property in the vicinity of his trailer. On August 6, 1984, an inspector for the Kentucky Department of Mines and Minerals issued a mine closure order against the Arlie Lawson Coal Company, and the order was never lifted. During the years 1985 through 1989, no permit to mine the property was issued to defendant.
 
 
 3
 In 1984 Leslie Gibbs and others brought an action against defendant to quiet title to the tract of land being mined by defendant. In that litigation, the Circuit Court of Whitley County, Kentucky, issued a temporary restraining order against defendant on June 15, 1984, and, on October 16, 1985, superceded it with a temporary injunction, which, among other things, enjoined defendant from disturbing the surface of, or extracting coal from, the property. According to defendant, on July 8, 1986, the Circuit Court of Whitley County entered a judgment adverse to defendant and determined that most of the disputed property belonged to the Gibbs family. Brief of Appellant at 5. Both parties appealed from that decision, and on May 6, 1988, the Kentucky Court of Appeals held that defendant had no claim whatsoever to the disputed property. On April 10, 1989, the Circuit Court of Whitley County entered judgment against defendant and awarded the Gibbs family $969,178 in damages for coal unlawfully removed from their property by defendant. The final judgment also enjoined defendant permanently from removing coal or timber from the lands of the Gibbs family.
 
 
 4
 While the litigation with the Gibbs family was in progress, the Natural Resources Environmental Protection Cabinet of the Commonwealth of Kentucky was also engaged in litigation with defendant to restrain him from unlawful mining. On March 13, 1986, a restraining order was issued by the Circuit Court of Franklin County, Kentucky, at the request of the Natural Resources Environmental Protection Cabinet. This restraining order enjoined defendant and all persons acting in concert with him from all coal mining activities in the Mud Creek area of Whitley County or any other place in Kentucky unless defendant first obtained a valid mining permit. This restraining order was made permanent on June 23, 1986, by the Circuit Court of Franklin County, which also found that defendant had mined coal in the Mud Creek area of Whitley County without a valid surface mining permit in violation of the court's previous restraining order. In addition to making its injunction permanent, the court sentenced defendant to ninety days in jail and imposed a fine of $5,000 for contempt of court.
 
 
 5
 On May 5, 1986, the Kentucky Department of Mines and Minerals issued a closure order in the name of the Arlie Lawson Coal Company for a mine being operated on the Pine Mountain side of Mud Creek Road. This closure order remained in full force at all times material to this case.
 
 
 6
 Despite these restraining orders, injunctions, lawsuits, and closure orders, defendant continued to mine coal from the property. Defendant's wife at the time, Sandra Lawson, testified that defendant mined coal in partnership with Jim Walden during 1984 and 1985. Walden ran the equipment, and defendant provided the fuel and the dynamite necessary for the operation. Sandra Lawson overheard defendant and Jim Walden discuss the fact that they were mining coal in violation of mining laws and regulations. Theresa Walden, Jim Walden's wife, drove to LaFollette, Tennessee, and bought explosives for use at the mine site. The coal was sold to Dean Chambers, a supplier of the Tennessee Valley Authority in Tennessee, and the proceeds were divided between Walden and defendant.
 
 
 7
 In December 1985, Walden left Mud Creek and did not return for approximately a year. When he did return, he went to work for defendant, who was then operating the mines in partnership with James Freeman. Defendant supplied the fuel and explosives, and Freeman and his son provided the equipment. The equipment was operated by the Freemans, and by defendant and his son, Matt, a minor. Freeman sold the coal and split the proceeds with Sandra Lawson. The coal from this venture was sold primarily to the Kincaid Coal Company in Thornhill, Tennessee.
 
 
 8
 During 1985, 1986, and 1987, defendant also participated in deep mining on the disputed property. In particular, Vester McFarland and James Lane mined coal which defendant sold to Allegheny Coal in Tennessee.
 
 
 9
 During the times of the mining alleged in the indictment, defendant was assisted by his minor son, Matt, who operated heavy equipment, often working late at night or early in the morning to avoid mine inspectors. On several occasions before he was old enough to obtain a driver's license, Matt Lawson drove alone to LaFollette, Tennessee, to purchase powder and dynamite for use in his father's mining operations.
 
 
 10
 Defendant and seven others were charged in a twelve-count indictment with offenses involving illegal mining, employing child labor, illegal explosives transactions, and interstate transportation of stolen coal. Defendant was charged in nine of the counts and on June 5, 1991, was convicted on Counts 1, 4, 5, 6 and 8. However, the district court granted defendant's motion for judgment of acquittal as to Count 4.
 
 
 11
 On October 25, 1991, defendant was sentenced to imprisonment for sixty-five months. This timely appeal followed.
 
 II.
 A.
 
 12
 Defendant argues that the district court erred in refusing to give defendant's proposed instruction to the effect that the litigation between the Gibbses and the defendant "was begun in the year 1984 and that such case was finally concluded in favor of the Gibbs family on the date of April 10, 1989, in accordance with the records of the Whitley Circuit Court." J.A. 71. In its charge conference held before instructing the jury, the district court declined to use this instruction because the court believed that, for purposes of determining the point at which defendant had no right to the coal, the critical date was July 8, 1986, the date on which the Circuit Court of Whitley County entered a judgment adverse to defendant, not the much later date, April 10, 1989, on which the Circuit Court of Whitley County entered its final judgment after an intervening appeal.
 
 
 13
 At the charge conference, counsel for defendant was clearly told that his instruction was unacceptable and "not a correct statement of law." J.A. 787. Counsel had some colloquy with the court concerning this matter, but at no point did he object to the court's direct refusal to instruct as requested. After the district court had read its instructions to the jury and formally asked counsel whether there were any objections to the charge as given, counsel for defendant responded in the negative.
 
 
 14
 Federal Rule of Criminal Procedure 30 provides in relevant part:
 
 
 15
 No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.
 
 
 16
 In Woodbridge v. Dahlberg, 954 F.2d 1231, 1236 (6th Cir.1992), this court recently summarized the requirements for preserving objections to a district court's instructions.[1] In recognizing the general rule in this circuit that formal objections should be made both at the charge conference and after the jury instructions are read to the jury, this court noted its earlier case of Murphy v. Owens-Illinois, Inc., 779 F.2d 340, 345-46 (6th Cir.1985), and stated:
 
 
 17
 In Murphy, counsel excepted to a jury instruction at a pre-charge conference, at which many issues relating to the instructions were discussed, saying that the instruction did not apply to the case on trial. The trial judge then gave his reasons for including the instruction. No further discussion about this part of the charge occurred. Counsel did not object to this part of the charge when the lawyers were called to the bench after the instructions were read. This court held that the issue concerning the charge was not preserved for appellate review and ... noted that "[t]he objections should be made not only before the jury retires, but after the charge is given."
 
 
 18
 (Citation omitted).
 
 
 19
 The record shows that counsel for defendant did not object before or after the instructions were given, either to the charge as given or to the district court's refusal to include defendant's requested instruction in the charge. Therefore, defendant waived any objection he may have had to the charge.[2] However, we conclude that even if there were no waiver, the court's charge, when considered as a whole, was fair to defendant. U.S. v. Williams, 952 F.2d 1504, 1512 (6th Cir.1991). In this connection, we note that the charge could have permitted the jury to find defendant innocent even though the civil jury in the state case found him in effect guilty of trespassing.
 
 B.
 
 20
 Defendant also argues that there was insufficient evidence to convict him on all the counts of which he was convicted. When insufficiency of the evidence is alleged as a ground for appeal, the reviewing court determines "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 475 U.S. 1017 (1986) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).
 
 
 21
 Defendant argues that he could not be guilty of the offense alleged in Count 6 of the indictment, the transportation in interstate commerce of stolen goods of a value of $5,000 or more in violation of 18 U.S.C. § 2314, because there was no evidence of any theft of the coal. He argues that his boundary line dispute with the Gibbses negates any possible knowledge on his part that the coal was "stolen," and, therefore, he cannot be guilty of a crime that requires the element of scienter. He also argues that this failure of proof on the question of scienter vitiates his conviction on Count 1, because Count 1 charges that one of the objects (among many) of the conspiracy was the sale of stolen coal in interstate commerce. Defendant further argues generally that "[t]he aforestated concepts and legal principles apply to the conviction under Count 5 of the Indictment herein." Brief of Appellant at 16. However, he does not say how or why his alleged lack of knowledge that the coal in question was stolen could apply to the charge in Count 5 which concerns the interstate transportation of explosives with intent to damage real estate, a violation of 18 U.S.C. § 844.
 
 
 22
 Viewed in the light most favorable to the government, there is ample evidence from which the jury could have inferred that defendant knew his conduct was illegal and that the coal he sold was indeed stolen. The jury may have inferred from defendant's failure to obtain coal mining permits that defendant knew he could not obtain a permit to mine the property of another. From his continued mining in the face of a growing list of restraining orders, temporary injunctions, permanent injunctions, and mine closure orders, the jury could have reasoned that defendant was utterly heedless of anyone else's interest in the property. The surreptitious means used by defendant to accomplish his purposes were also circumstantial evidence of guilty knowledge. Finally, the jury would have been justified in drawing the inference that, as of July 8, 1986, when the Circuit Court of Whitley County rendered its decision in favor of the Gibbses' claim to the property, defendant must have known that he was thenceforth without any right in or title to the property and that any coal removed from the property by him and his confederates was necessarily stolen. Of course, other inferences from these facts are possible, but the foregoing inferences are rational ones leading to guilt, and, therefore, the jury's verdict is based on acceptable evidence that defendant knew that the coal he placed in interstate commerce was stolen. Because the question of scienter is defendant's only challenge to the sufficiency of the evidence on Counts 1, 5 and 6, the convictions on all these counts will be affirmed.
 
 
 23
 As to Count 8, which charges defendant with failing to file coal production statements in violation of 30 U.S.C. § 1232(c), (d), defendant argues that there is no proof that he was a mine "operator" who was required to file coal production statements. Defendant stipulated at trial that no quarterly tonnage reports were ever filed. The record, however, contains abundant evidence from which a rational jury might conclude that defendant was the operator of these mines and was therefore the person obligated to file the reports in question. The evidence shows that defendant controlled access to the mines, that he personally operated mine equipment and extracted coal, that he provided the fuel for the heavy equipment used at the mine site, that he supplied the necessary explosives, that he hired people, such as James Walden, to work for him, and that he received at least 50 percent of the proceeds of all coal sales--a percentage of profits much higher than he would have received in royalty payments as a mere lessor of the mine sites. This was ample evidence from which a jury could conclude that defendant was an operator as charged. The stipulation that no coal production statements were ever filed completes the evidence necessary to convict defendant on Count 8.
 
 C.
 
 24
 Defendant argues that the government withheld exculpatory materials from him and thus violated his right to a fair trial. The first document that defendant contends should have been produced was a report of interview by government investigator Alex Sorke prepared after he interviewed Roy Rowe during the investigation of this case. During the direct examination of defendant, a question arose about the existence of this report of interview, and the government promptly produced the report to the court for determination of whether it contained any exculpatory material. Matt Lawson, the defendant's son, had previously testified that he and Roy Rowe bought explosives together at Wayland Explosives in LaFollette, Tennessee, explosives which were used on the mine sites here in question. According to the district court's statement of the contents of Agent Sorke's report, Rowe told Agent Sorke that Matt Lawson was not with him when he picked up explosives at LaFollette. Rowe is said not to have stated in the report of interview where the explosives he bought were used. After the court in effect disclosed the contents of the report of interview to defendant and his counsel, the court afforded them an opportunity to issue a subpoena for Roy Rowe. However, defendant declined this offer and elected to proceed with the trial.
 
 
 25
 The report of interview in question may have had some value in the impeachment of Matt Lawson's testimony to the effect that he purchased explosives in LaFollette with Roy Rowe. Defendant, however, does not argue that he made a specific pretrial request for this allegedly exculpatory report of interview. Assuming that he made a general request for exculpatory material under Brady v. Maryland, 373 U.S. 83 (1963), a reversal would be required only where the undisclosed evidence deprived defendant of a fair trial, i.e., the suppression undermines confidence in the outcome. United States v. Bagley, 473 U.S. 667 (1985). In this case, the government promptly produced the allegedly exculpatory statement, the district court advised defendant of its contents, and provided defendant with the opportunity to subpoena the party who allegedly made the statement. Thus, the statement was produced on request, and the defendant was allowed the opportunity to subpoena the interviewee for whatever impeachment testimony he thought he could obtain. Defendant declined this opportunity. Moreover, the existence of this evidence does not create a reasonable doubt in this case, particularly in view of its limited value as impeachment material and in view of the long parade of other witnesses against the defendant.
 
 
 26
 Defendant also argues that two bills of sale used to impeach him during cross-examination were exculpatory documents that should have been provided to him. On cross-examination, the government questioned defendant about whether he had ever owned a Michigan 275 loader. When he denied it, the government produced two bills of sale, one apparently in the sum of $2,000 for a Michigan 275 loader, the other for a Komatsu bulldozer. The defendant admitted the sales and explained that the equipment was junk equipment belonging to Jim Walden which defendant sold because Walden owed him money.
 
 
 27
 The district court correctly ruled that the bills of sale were not producible as discovery under Federal Rule of Criminal Procedure 16 because they were used only in impeachment and not in the government's case-in-chief. As to whether the bills are exculpatory or not, defendant cannot seem to make up his mind. After arguing that they are exculpatory matters which should have been produced because they might have had some unspecified tendency to impeach other government witnesses, defendant alternatively contends that the bills of sale were confessions by the defendant and thus producible as matters of pretrial discovery under Rule 16. Had these documents been produced to defendant prior to trial, they would not have altered the outcome in this case, and the failure to produce them, therefore, even if erroneous, is not reversible error under Bagley. Defendant's alternative view of these documents as confessions is utterly without merit, and, not surprisingly, defendant advances no authority in support of this contention.
 
 D.
 
 28
 Finally, defendant challenges the district court's computation of loss under United States Sentencing Guidelines §§ 2B1.1 and 2B1.3. Under 18 U.S.C. 3742(e), this court must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts."
 
 
 29
 In order to ascertain the amount of coal removed from the Gibbses' property and to calculate the amount of damage done to that property, the district court appointed an expert mining engineer to examine the property and provide an opinion on these matters. The engineer estimated that the value of the coal removed from the property was $414,048 and that the cost of reclamation was $135,031. The total loss, therefore, was $549,077, and the court used this figure in its sentencing calculations.
 
 
 30
 Defendant argues that the court should have measured the loss for coal removed from the property by defendant's coal sales to various coal tipples or trucking companies as proven at trial. This amount, according to defendant, is $105,553.11. He also argues that he should be punished only for the amount of his coal sales after July 8, 1986, the date on which the Circuit Court of Whitley County entered its judgment against defendant. Defendant contends those sales amounted to $39,751.31.
 
 
 31
 For the purposes of U.S.S.G. § 2B1.1, loss is defined as follows:
 
 
 32
 "Loss" means the value of the property taken, damaged or destroyed. Ordinarily, when property is taken or destroyed, the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim. When property is damaged, the loss is the cost of repairs, not to exceed the loss had the property been destroyed.
 
 
 33
 U.S.S.G. § 2B1.1, comment. (n. 2). The application notes also state that "the loss need not be determined with precision, and may be inferred from any reasonably reliable information available, including the scope of operation." Id., comment. (n. 3).
 
 
 34
 The Guidelines specifically permit the "cost of repairs," i.e., reclamation, to be considered along with the "value of the property taken." Thus, the district court was fully justified in relying on its expert's calculations unless those calculations were shown to be inaccurate. At the sentencing, however, defendant conceded the accuracy of the expert's calculations. His attorney stated, "I think personally, from my point of view, that is the best estimate of everything here." J.A. 830. He went on to state, "I think he's our expert and if the Court will accept that, then I think I have no basis to argue otherwise. Thank you, Your Honor." J.A. 831.
 
 
 35
 Following these concessions, the court announced its calculations, and defendant objected, not to the calculations themselves, but to the court's failure to use royalty estimates on the coal taken from the property in question rather than the fair market value of the coal. On appeal, however, defendant does not argue that royalty estimates should have been used instead of fair market value, and he has therefore abandoned this argument. Boyd v. Ford Motor Co., 948 F.2d 283, 284 (6th Cir.1991), cert. denied, 112 S.Ct. 1481 (1992); McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986).
 
 
 36
 Even if defendant had not conceded this question below, the government is correct in arguing that the measure of damages in this case is not confined to the value of the royalties--generally 10 percent of the market value of the coal. In United States v. Johnson, 941 F.2d 1102, 1113-14 (10th Cir.1991), a defendant who fraudulently obtained rental property and charged rents on the property was sentenced on the basis of the loss measured by the amount of the rents he collected and the value of the real estate he fraudulently obtained. The property owner in Johnson lost not only the rents on his property but the property itself. Similarly, the loss in this case was the entire market value of the coal, not just the royalties it could have produced. The district court was correct in concluding that the measure of loss should be the market value of the coal taken.
 
 
 37
 Defendant also argues that his sentence should not be based on loss sustained by the property in question prior to July 8, 1986, the date on which the Circuit Court of Whitley County ruled that the property did not belong to defendant. Defendant has not raised this issue below and is now precluded from raising it on appeal. U.S. v. Pickett, 941 F.2d 411, 415 (6th Cir.1991). Moreover, it is clear from the colloquy between the district court and defense counsel at sentencing that counsel conceded the correctness of the engineer's estimate of the value of the lost coal--$414,048--subject only to his objection that he should be charged with only 10 percent of that amount because the loss should be construed as a loss of royalties only. J.A. 831-37. When the court finally announced its total loss figure of $549,000, counsel for the defendant concurred in it, stating, "Yes, that's my agreement subject to my previous objection." J.A. 837. The previous objection had to do with the use of royalty figures rather than fair market value figures in the computation of the loss. Therefore, defendant did not raise below the question about coal losses and property damage occurring before July 8, 1986, and this court should not consider the argument on appeal.
 
 III.
 
 38
 For the reasons stated, the judgment of the district court is AFFIRMED in all respects.
 
 
 
 *
 Honorable Julian A. Cook, Jr., Chief United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Although Woodbridge is a civil case, the requirements are the same. Compare Fed.R.Crim.P. 30 with Fed.R.Civ.P. 51
 
 
 [2]
 Neither does the submission of a special request to charge operate as an explicit objection to the court's instructions. Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir.1985)