**Glen McMURPHY, Plaintiff-Appellant,**

v.

**CITY OF FLUSHING, and Bernard Van Osdale, Vernon Royston, Individually and Jointly, Defendants-Appellees.**

No. 85–1472.

United States Court of Appeals, Sixth Circuit.

Argued July 15, 1986.

Decided Sept. 29, 1986.

---

Charles H. Noble (argued), Suo, Noble & Wiseman, Southfield, Mich., for plaintiff-appellant.

Lance R. Mather, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., Alan S. Brostoff, Von Briesen & Redmond, S.C., Milwaukee, Wis., Steven B. Rynecki (argued), for defendants-appellees.

Before LIVELY, Chief Judge, and WELLFORD and BOGGS, Circuit Judges.

LIVELY, Chief Judge.

A former policeman of the City of Flushing, Michigan appeals dismissal of his civil rights action arising out of his discharge from employment. In his complaint the plaintiff sought damages and an injunction restoring him to this former position with back pay and benefits. The district court conducted a two-day hearing on plaintiff's motion for a preliminary injunction. The complaint claimed deprivation of due process by failing to hold a pretermination hearing, deprivation of the First Amendment right to freedom of speech by discharging plaintiff for statements made to his superiors and to persons outside the police establishment, and violation of Michigan's Whistleblower's Protection Act.

After denying the motion for an injunction the district court received briefs and heard oral arguments on the motions for summary judgment. The district court had the transcript of testimony at the injunction hearing, and the parties supplied por-

tions of the transcript of an arbitration hearing held as the final stage of plaintiff's grievance of his discharge. Both McMurphy and the defendants relied on portions of the arbitration transcript as well as the transcript of the injunction hearing. At the injunction hearing the parties agreed that testimony taken on that occasion could be considered by the court in ruling on the summary judgment motions. The district court denied plaintiff's motion for summary judgment and granted the motion of the defendants.

## I.

### A.

McMurphy began working as a full-time patrolman in 1977 after serving on a part-time basis for several years. He was suspended for 10 days on February 23, 1983 for violating departmental regulations "relative to dishonesty, insubordination, personal conduct, performance of duty, and transmission of information." The specific charge was that, in the presence of other persons, McMurphy made false statements to a newspaper reporter in which he accused the city manager of Flushing and various members of the police department of misconduct and cover ups. The incident referred to in the charges occurred in a bar when McMurphy was off duty. McMurphy told a newspaper reporter that his paper did not print the real news, but only what the city officials wanted printed. McMurphy referred to a "fire up on Beech Street," and hinted at misconduct in high places. The newspaper reporter told the chief of police about the conversation and this led to the charges for which McMurphy was suspended.

Immediately after the meeting at which he was notified of the suspension McMurphy, in strong and vulgar language, told both the chief of police and his second in command, Lieutenant Peraino, that they were incompetent. He also told the chief of police, "the whole world is going to come down around you when a court of law get this, for your siding with that back-stabbing son-of-a-bitch City Manager."[1] Apparently McMurphy and the city manager, Bernard Van Osdale, had been friendly at one time, but had fallen out. While leaving the city building on February 23 McMurphy encountered Van Osdale, castigated him, threatened him with a lawsuit and urged Van Osdale to take a swing at him so he could retaliate. Before the day was over McMurphy talked with the newspaper reporter again and threatened him with a lawsuit. Sometime later McMurphy attended a retirement party for the chief of police of a nearby town. When asked by a third chief why Chief Royston was not socializing with his men, McMurphy replied that they had no respect for his leadership. McMurphy also posted two vulgar cartoons on the police department bulletin board, which implied that nothing was ever accomplished in the department and that those who worked diligently got "screwed."

### B.

On May 5, 1983 Royston called McMurphy to his office, read a list of charges, and suspended him with pay until May 10. Royston testified that McMurphy was given an opportunity to respond, but McMurphy denied that he had such an opportunity. The notice of suspension with pay directed McMurphy to present himself on May 10 for final disposition of the charges. At the May 10 meeting the chief of police gave to McMurphy and his attorney a document styled, "Specific Charges—Notice of Discharge." The notice stated that following the February suspension and in spite of a specific warning about the consequences of insubordination and dishonesty, McMurphy had continued to conduct himself improperly. Examples of misconduct were listed. These included a threatening to the newspaper reporter whom McMurphy had encountered in the bar that McMurphy would "get him" if he was responsible for

---

1. McMurphy contended that the statements to Chief Royston were made after he was assured that nothing he said would be used against him. Nevertheless, he did not deny making similar statements to others, including city council members.

the February suspension; making statements ridiculing the city manager and chief of police, and threatening to "get them"; approaching council members while in uniform and making abusive, ridiculing and derogatory statements about the city manager and chief of police; making groundless complaints about the city manager and other officials to state police and a public prosecutor; making critical statements about Chief Royston to another chief of police; posting the cartoons disparaging the police department; and writing anonymous inflammatory letters to the local press and councilmen.

McMurphy testified that he was given no hearing on the charges and that when his attorney asked questions about them he was told to contact the city's lawyer "in Wisconsin." The chief of police testified that McMurphy was given a chance to respond, but that his attorney merely asked for a copy of the charges and made no comments.

### C.

Following his suspension McMurphy began "investigations" of Van Osdale for activities he considered illegal, although no one had directed him to make such investigations. In his investigations McMurphy contacted the public prosecutor and state police in an effort to have the city manager charged with embezzlement. He also contacted members of the city council, urging them to do something about the city manager. Neither the state police, the prosecutor nor the city council took any action when informed that the "embezzlement" consisted of the city manager's storing some personal property in a vacant city building.

In his testimony before the arbitrator and the district court McMurphy denied that he threatened the newspaper reporter with bodily harm and denied that he sent anonymous letters. He admitted threatening the reporter with a lawsuit for going to the chief of police and admitted threatening

both the chief of police and the city manager with loss of their jobs. He admitted conducting the unauthorized "investigations," telling the city manager he would "get him" if it cost $20,000, calling the chief of police a "backstabbing son-of-a-bitch" and telling the out of town chief that Royston did not deserve respect. He also admitted posting the two derogatory cartoons.

Chief Royston testified that it was against regulations to conduct unauthorized investigations and to post cartoons of the type described on the bulletin board.[2] Furthermore, McMurphy never prepared a formal report on the alleged misconduct, although regulations required that this procedure be followed. The Flushing Police Department is very small—the chief of police, one lieutenant, one sergeant and nine full-time and seven part-time patrolmen. All members of the department must work together in a close relationship. Royston testified that although there had been some earlier dissension in the department, McMurphy's conduct was extremely disruptive. McMurphy would not discuss his complaints with the chief or the lieutenant, but caused the men in the department to choose between him and their supervisors. The chief testified that McMurphy's conduct undercut his authority over the department.

### II.

In separate rulings the district court found that the discharge did not deprive McMurphy of due process or of First Amendment free speech rights.

The district court found that McMurphy was provided prior notice and a statement of specific reasons for the discharge. The court further found that McMurphy was provided a sufficient hearing after the discharge, and that he was not entitled to a pretermination hearing. The district court relied on the Supreme Court's plurality

---

2. McMurphy testified that cartoons were frequently posted on the bulletin board, but did not show that any others had ridiculed the police department.

opinion in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In granting summary judgment on the First Amendment claim the district court found that McMurphy was discharged for things he said—accusations of incompetence and wrongdoing, threats against his superiors in the police department and the city manager and disparaging comments about Royston and Van Osdale to city council members, other police officers and the state police and prosecutor. The district court recognized that comments by public employees on matters of public concern are protected speech, but concluded that if such speech has a detrimental effect on the operation of a public agency, a balancing of interests is required. Referring to McMurphy's own testimony the court found that the plaintiff acted out of spite in remarks about Chief Royston and the city manager and that he was "venting [his] personal frustration" in threatening to "get" various officials. The court found that the one-man investigations of "public corruption" were unauthorized and contrary to regulations, and that there was nothing constructive about any of McMurphy's criticisms of the police department.

Even with respect to the allegations of official corruption, a matter of obvious concern to the public, the court found that a balancing of interests clearly favored the defendants. The charges were considered unfounded when investigated by outside agencies. More importantly, however, the overall conduct was "extremely disruptive" to the operations of a small police force and McMurphy's interest in the alleged corruption was "dubious." The district court concluded that McMurphy's discharge did not violate the First Amendment. Since both federal claims were denied the district court dismissed the pendent state claim.

### III.

#### A.

McMurphy argues that summary judgment on the First Amendment issue was improper since there were numerous disputed issues of material fact. As the district court noted, McMurphy's brief in opposition to summary judgment contained the statement, "Plaintiff does not have a great deal of dispute as to Defendant's rendition of facts." Nevertheless, McMurphy did dispute the defendants' interpretation of some of his statements upon which the discharge was based. If this were a typical summary judgment case where only the pleadings and exhibits, including affidavits, were before the court, we might be impressed with McMurphy's argument that he was entitled to have all inferences drawn from the facts viewed in the light most favorable to him. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

However, the district court held a two-day hearing at which both McMurphy and Royston testified and it had portions of the transcript of an arbitration hearing at which these parties and other witnesses testified about the circumstances preceding and surrounding McMurphy's discharge. The district court relied largely on McMurphy's own testimony in concluding that matters of public concern played little, if any, part in McMurphy's "investigations" and statements about his superior officers. The district court considered an extensive record and found no genuine issue of material fact. Those facts which were disputed were not material to the ultimate issue in light of the balancing conducted by the district court. In view of the fact that McMurphy and Royston testified in person before Judge Newblatt, we believe he had sufficient basis for drawing the inference that McMurphy acted out of spite and frustration in attacking Royston and Peraino, rather than for the purpose of illuminating matters of public concern.

In addition to the requirement that there be no genuine issue of material fact, the moving party must be entitled to judgment as a matter of law for summary judgment to be granted. Rule 56(c), Fed.R.Civ.P. McMurphy argues that he, not the defendants, was entitled to summary judgment upon the trial court's finding that he was

discharged for the statements he made. He contends that the district court did not properly apply the "balancing" test prescribed in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 1735, 20 L.Ed.2d 811 (1968), and expounded upon in *Mt. Healthy City School District Board v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). McMurphy also insists that the district court reached the wrong conclusion in determining that his statements did not relate to matters of public concern. *Connick v. Meyers,* 461 U.S. 138, 97 S.Ct. 568, 50 L.Ed.2d 471 (1983).

In his brief, and at oral argument, McMurphy repeatedly referred to the facts surrounding his suspension on February 23, 1983. However, his complaint charged discrimination only by reason of his discharge on May 10, 1983. If McMurphy had been discharged for telling a newspaper reporter that there were misconduct and cover ups in the police department, an entirely different view of this case would be required. Obviously, the public is concerned with how a police department is operated, and efforts to give public exposure to alleged misconduct are protected. However, as the notice and specifications made clear, McMurphy was discharged for his conduct subsequent to his suspension. This conduct consisted of verbal attacks on his superior officers and statements to other officers, both within and outside the department, that the chief and the lieutenant were incompetent. This conduct, including the posting of the derogatory cartoons, had the natural effect of disrupting the operation of this small city police department without imparting any information to the public. The district court properly limited its analysis of the First Amendment claim to the discharge; the earlier suspension was not the basis of McMurphy's claim.

**B.**

McMurphy's appellate stance on the due process claim is quite simple and direct: The district court erroneously relied on *Ar-*

*nett v. Kennedy* to conclude that he was not entitled to a pretermination hearing. Later authority, particularly *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), has made it clear that a public employee may not be discharged without a pretermination hearing.

**IV.**

**A.**

Turning first to the due process issue, we agree with McMurphy that *Loudermill* requires a pretermination hearing before a public employee can be discharged. This is a "root requirement" of the Due Process Clause. *Loudermill,* 105 S.Ct. at 1493. The defendants contend that they did afford McMurphy a pretermination hearing that would satisfy *Loudermill.* The district court did not have the benefit of the Supreme Court's pronouncement in *Loudermill* and did not determine whether McMurphy was given such a hearing. The evidence on this question is in direct conflict, and resolution of this conflict requires further proceedings in the district court. On remand the issue will be whether McMurphy had "an opportunity to present his side of the story." *Id.* at 1495 (citations omitted).

**B.**

Upon consideration of the entire record we affirm summary judgment on the First Amendment issue. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1967), requires a balancing of the interest of a public employee in the right to comment on matters of public concern in connection with his work against the interest of the state in maintaining efficient and orderly operations.

The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1734–35. In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court emphasized that the *Pickering* balancing is required only when a public employee's statements can "be fairly characterized as constituting speech on a matter of public concern...." *Id.* at 146, 103 S.Ct. at 1689–90. The Court explained its holding as follows:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable. *Board of Regents v. Roth,* 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972); *Perry v. Sindermann, supra; Bishop v. Wood,* 426 U.S. 341, 349–350 [96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684] (1976).
> We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. "[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.'" *Mine Workers v. Illinois Bar Assn.,* 389 U.S. 217, 223 [88 S.Ct. 353, 356–57, 19 L.Ed.2d 426] (1967), quoting *Thomas v. Collins,* 323 U.S. 516, 531 [65 S.Ct. 315, 89 L.Ed. 430] (1945). We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction. See *Chaplinsky v. New Hampshire,* 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031] (1942); *Roth v. United States, supra; New York v. Ferber,* 458 U.S. 747 [102 S.Ct. 3348, 73 L.Ed.2d 1113] (1982). For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street. We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Cf. *Bishop v. Wood, supra,* at 349–350 [96 S.Ct. at 2079–80]. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.

*Id.* at 146–47, 103 S.Ct. at 1690–91.

The Supreme Court prescribed the method for determining when a public employee's speech addresses a matter of public concern. The trial court must make this determination, as a matter of law, on the basis of "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690, 1691 (footnote omitted). *Connick* also reaffirmed that if any part of the speech of an employee that contributes to the discharge relates to matters of public concern, the trial court must conduct a *Pickering* balancing of interests. *Id.* at 149–50, 103 S.Ct. at 1690, 1691.

■ The district court followed the *Connick* prescription in the present case. It determined, from an extensive record, that most of McMurphy's accusations, threats and abusive conduct toward his superiors in the police department and city government were made in spite and were a venting of personal frustration. The record

fully supports this conclusion. For some reason not disclosed in the record, McMurphy was determined to get rid of the city manager and to have Lieutenant Peraino removed from his command position. This is clear from McMurphy's own testimony. McMurphy did not follow regulations or file formal reports in connection with his "investigations" and campaign to have the city manager charged criminally. All the earmarks of a personal vendetta are present. His remarks to and about Chief Royston and Lieutenant Peraino were clearly insubordinate and served no public purpose.

The district court recognized as well, however, that any sincere effort on the part of McMurphy to expose official corruption would relate to a matter of public concern. Although he found McMurphy's interests in such an exposure "dubious," Judge Newblatt weighed the speaker's right to free speech against the city's need to have an efficient police force. In doing so the district court found a clear balance in favor of the city. The methods followed by McMurphy were extremely disruptive. In striking a balance in favor of the employee in *Pickering* the Supreme Court noted that the plaintiff's criticism was not directed at any one he would be working with on a day-to-day basis. 391 U.S. at 570, 88 S.Ct. at 1736. The situation was quite different in the present case. McMurphy ridiculed and challenged the authority of the two top officers in a very small police department where close working relationships were required. The Court emphasized the matter of the closeness of working relationships in *Connick:*

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.

461 U.S. at 151–52, 103 S.Ct. at 1691, 1692 (footnote omitted). Instead of following

prescribed procedures and filing written reports about suspected wrongdoing and permitting investigations by others with no personal animosity against the alleged wrongdoers, McMurphy insisted on conducting unauthorized investigations and seeking to have criminal proceedings initiated on the basis of his view of events.

■ Considering the "content, form, and context of [McMurphy's statements], as revealed by the whole record," *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690, 1691, the district court found that only a small part of McMurphy's statements and conduct could be considered to relate to matters of public concern, and that with respect to these matters the legitimate interests of the City of Flushing outweighed McMurphy's interest in freedom of speech. McMurphy relies on several decisions from other courts of appeals where First Amendment claims of public employees have been upheld. *E.g., McGee v. South Pemiscot School District,* 712 F.2d 339 (8th Cir. 1983); *Leonard v. City of Columbus,* 705 F.2d 1299 (11th Cir.1983), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984); *Brockell v. Norton,* 688 F.2d 588 (8th Cir.1982); *Porter v. Califano,* 592 F.2d 770 (5th Cir.1979). The courts employed the balancing of interests required by *Pickering* in all of these cases and concluded that the balance favored the plaintiff. Some were decided before *Connick v. Myers* and some came later. We have no quarrel with any of the cited decisions, but agree with the district court that the balance in the present case weighs in favor of the defendants. Our case more nearly resembles *Hughes v. Whitmer,* 714 F.2d 1407 (8th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984), where the court found that the plaintiff's "various dissension causing speech-related activities" were not "of such public and social importance as to override the [State Highway] Patrol's substantial interest in maintaining troop morale." *Id.* at 1421. We find that the district court properly resolved this issue, and affirm its dismissal of the First Amendment claim.

■ McMurphy also pled that the city's police rules and regulations are facially

unconstitutional for vagueness and overbreadth. He did not pursue this argument before this court, and we consider it abandoned.

## CONCLUSION

The judgment of the district court is affirmed insofar as it dismissed McMurphy's First Amendment claim. The judgment is vacated as to the City of Flushing and Royston insofar as it dismissed the due process claim and the pendent state claim based on the Michigan Whistleblower's Protection Act. Upon remand the district court will conduct appropriate proceedings to determine the due process issue, and reconsider the pendent claim in light of the outcome of those proceedings. Since there was no evidence that Bernard Van Osdale was involved in any way in the decision to discharge McMurphy, dismissal of all claims against this defendant is affirmed.

Van Osdale will recover costs from McMurphy. The other parties will bear their own costs.