992 F.2d 1216
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Deborah Kaye HUDSON, Plaintiff-Appellee,
v.
WASHINGTON COUNTY, Tennessee, Defendant,
Susan Mitchell STANLEY; Stewart L. Cannon, Jr.; John L.
Kiener, in their Individual Capacities,
Defendants-Appellants.
 No. 92-5763.
 United States Court of Appeals, Sixth Circuit.
 April 5, 1993.
 
 Before JONES and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The plaintiff, a former public employee, brought this § 1983 action against her former county agency and several county officials alleging that she was terminated in retaliation for her statements to state investigators exploring possible misconduct in the county agency. The officials appeal the district court's denial of their motions for summary judgment on the ground of qualified immunity. Upon a review of the record, we affirm.
 
 I.
 
 2
 Plaintiff, Deborah Hudson, began working for the Washington County, Tennessee, Juvenile Services Office in 1984, first as a volunteer and then as a secretary. In 1985, she was elevated to the rank of Juvenile Court Officer, or Youth Services Officer (YSO), as it was titled at the time of her discharge in 1990. She worked in a small office, which included a director, two YSOs, and a secretary. During most of Hudson's time at the Juvenile Services Office, Buddy Stuart was the director. It was an investigation of Stuart by the Tennessee Bureau of Investigation (TBI) and Hudson's involvement in that investigation which she alleges precipitated her discharge.
 
 
 3
 The TBI launched its investigation of Stuart after a former employee of the Juvenile Services Office publicly questioned Stuart's conduct in office. According to Hudson, she was then contacted by the TBI, and she complied with their request that she give a truthful statement regarding Stuart's behavior while in office. Hudson shared with the TBI her observations of Stuart, which included allegations that he misappropriated funds and equipment, falsified time records and mileage logs, and improperly handled checks and money orders. Hudson never publicly discussed these charges with the press or any other public body.
 
 
 4
 Stuart subsequently resigned from office on February 14, 1990, as part of an agreement with the district attorney that charges against Stuart would not be pursued any further in return for his resignation. At his deposition, the district attorney stated that he elected to reach such an agreement with Stuart in view of the small amount of money involved in the case and the expected cost of trying the matter.
 
 
 5
 After Stuart's resignation, defendant Susan Stanley was promoted to director of Juvenile Services. As director, Stanley was responsible for operation of the office, which is administered under the jurisdiction of the Washington County Juvenile Court and Judges Stewart Cannon and John Kiener, both of whom are defendants in this action. Hudson contends that when Stanley, Cannon, and Kiener became aware of her involvement in the TBI investigation, they harassed and threatened her.
 
 
 6
 Specifically, Stanley allegedly told Hudson that she did not want to work with a "narc," that she intended "to go after" those who made statements against Stuart, and that she would "help take care of" those who cooperated in the investigation of Stuart. Judge Kiener allegedly told Hudson that "he'd better not find out" that Hudson had cooperated in the investigation. All of these statements occurred prior to Stuart's dismissal.
 
 
 7
 After Stuart's discharge, Hudson alleges that the harassment and retaliation continued. Her job responsibilities were lessened, summaries of staff meetings were not distributed to her, and her desk was moved to a back office so that she had less contact with the entire office. In addition, Stanley complained about Hudson's work habits despite her excellent work record compiled prior to the TBI investigation. Finally, on August 31, 1990, she was fired by Judges Cannon and Kiener, who controlled personnel decisions in the office.
 
 
 8
 Defendants contend that several legitimate reasons exist for Hudson's termination which do not implicate the First Amendment. According to the defendants, Hudson's accusations destroyed the harmony in the office and disrupted staff relations. Her alleged insubordination, unprofessionalism, absenteeism, failure to take responsibility, lack of creativity, and lack of a college degree all contributed to her termination.
 
 
 9
 The trial court denied the defendants' motion for summary judgment. In response to the defendants' argument that Hudson's allegations failed to state a claim under the First Amendment, the court stated that "plaintiff's allegations do concern speech which was a matter of public concern, and that balancing of interests does not require a different conclusion at this juncture, because ... 'speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection,' and this form of alleged disloyalty does not affect the proper functioning of the department if the speech was made because the office was not functioning properly due to malfeasance." (App. 35-36). Finding such a doctrine "well-settled," the court likewise denied the defendants' qualified immunity motion.
 
 II.
 
 10
 Defendants argue on appeal that they are entitled to qualified immunity from Hudson's First Amendment claim, because the law on a public employee's First Amendment rights in August 1990 was neither simple nor clear. Moreover, defendants assert that they acted in an objectively reasonable manner in terminating Hudson, because she did much in the intervening period between her First Amendment statements to the TBI and her termination which justified her dismissal.
 
 
 11
 A government official acquires qualified immunity if his or her conduct does not violate clearly established federal "statutory or constitutional rights of which a reasonable person would have known" at the time the action was taken. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The proper inquiry is not whether the claimed right existed in the abstract, but whether a reasonable official would have known that the challenged conduct violated that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Under this test, then, a public official will be immune from suit "if officers of reasonable competence could disagree" on whether the conduct violated the plaintiff's rights. Malloy v. Briggs, 475 U.S. 335, 341 (1986). A reviewing court must therefore examine, first, whether a plaintiff has demonstrated a clearly established right existed that was violated by the defendant; and second, whether a reasonable official in the defendant's position should have known at the time he acted that his conduct violated that right. Meyers v. City of Cincinnati, 979 F.2d 1154, 1156 (6th Cir.1992). Since the applicability of a qualified immunity defense is a pure question of law, we review the district court's decision de novo. Grossman v. Allen, 950 F.2d 338, 341 (6th Cir.1991).
 
 
 12
 At the time of Hudson's termination in August 1990, the general contours of public employees' First Amendment rights were clear. As we stated previously, "speech of a public employee is protected if (1) the speech addresses a matter of public concern, and (2) the employer has no overriding state interest in efficient public service that would be undermined by the speech." Meyers, 979 F.2d at 1157 (citations omitted); see also Connick v. Myers, 461 U.S. 138, 146-50 (1983); Pickering v. Board of Educ., 391 U.S. 563 (1968).
 
 
 13
 On appeal, defendants do not seriously question whether Hudson's speech to the TBI involved a matter of public concern. Nor could they, for we have held previously that speech disclosing public corruption is a matter of public interest. Solomon v. Royal Oak Township, 842 F.2d 862, 865 (6th Cir.1988); Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir.1986) (plaintiff's cooperation with a Kentucky Attorney General's investigation resulting in an admission of fraudulent billing but in no interference with the operation of the agency was protected under the First Amendment). Rather, defendants contest whether Hudson met the second prong of the First Amendment analysis, because the value of her speech on a matter of public concern must be weighed against its impact upon the efficiency, discipline, and proper administration of the Juvenile Services Office. See Pickering, 391 U.S. at 569-70; Marohnic, 800 F.2d at 616.
 
 
 14
 Thus, we must decide whether the defendants reasonably could have believed that the harm to the office's efficiency outweighed Hudson's interest in speaking freely. Gossman, 950 F.2d at 343 n. 2. Having undertaken that analysis, we find that no reasonable public official could have concluded in August 1990 that Hudson's free speech interests were outweighed by concern for office efficiency. Indeed, as we have stated previously, public employees' speech regarding corruption increases efficiency by aiding in the disclosure of fraud and other misconduct. Marohnic, 800 F.2d at 616 ("[W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner"); see also Solomon, 842 F.2d at 866 (rejecting defendnat's claim that plaintiff's speech fails second prong of Pickering analysis, because plaintiff's "statements were made because the office was not functioning properly due to [defendant's] malfeasance").
 
 
 15
 Defendants argue that in August 1990 the law was both unsettled and quite fact specific as to each case, making it impossible for reasonable public officials to determine whether a claimed First Amendment violation was clearly established. They cite McMurphy v. City of Flushing, 802 F.2d 191 (6th Cir.1986), in support of their claims that the law in this area is somewhat confused. We fail to see any inconsistency between McMurphy and other case law in this area which stands for the proposition that disclosure of corruption deserves constitutional protection.
 
 
 16
 McMurphy involved a policeman who had been suspended for disclosing to a newspaper reporter alleged misconduct and cover-ups within the police department. Sixty days later, plaintiff was fired for insubordination and misconduct after he ridiculed the city manager and chief of police and threatened to "get them"; approached council members while in uniform and made disparaging statements about the city manager and chief of police; made critical statements about the chief of police to another chief of police; posted cartoons disparaging the police department; and wrote anonymous inflammatory letters to the local press and councilmen. Id. at 194. Plaintiff challenged his dismissal on First Amendment grounds, and we affirmed summary judgment against the officer.
 
 
 17
 Importantly, we noted at the outset that if the plaintiff had been discharged for telling a newspaper reporter that misconduct existed in the police department, "an entirely different view of [the] case would be required." Id. at 196. However, plaintiff contested only his discharge, and we upheld the district court's conclusion that plaintiff's post-suspension behavior was the result of spite and frustration, and his conduct imparted no information on matters of public concern. Thus, the plaintiff in McMurphy could not cloak himself in the First Amendment's protection.
 
 
 18
 In Guercio v. Brody, 911 F.2d 1179 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 168 (1991), we further clarified the distinction between speech which highlights public corruption and therefore deserves constitutional protection and other speech which is often outweighed by governmental concerns for efficiency. In Brody, a secretary working for a United States bankruptcy judge in the Eastern District of Michigan aided in the investigation of another bankruptcy judge in that court who later resigned after disclosures of corruption. After a replacement had been named but prior to his confirmation, the secretary circulated several newspaper articles to the press and others which discussed the nominee's purported representation of organized crime figures during an earlier stage of his career. The secretary was discharged with the approval of the chief district judge. The secretary then filed suit against both her bankruptcy judge employer and the chief district judge.
 
 
 19
 We granted qualified immunity to the chief judge, but only after considering plaintiff's First Amendment right to leak old newspaper articles to the press against "the public interest in restoring morale, cooperation, public respect and confidence to the Bankruptcy Court for the Eastern District of Michigan." Id. at 1187. Significantly, however, we also stated that, up to the point at which the plaintiff circulated the dated news articles critical of the nominee, "judges of reasonable competence could not but have believed that [plaintiff's] job security was protected by the first amendment as interpreted in Pickering." Id. at 1186. Therefore, where, as here, the alleged First Amendment activity consists solely of aiding an investigation of public officials, a plaintiff's free speech interests outweigh an employer's interest in efficient government service.
 
 
 20
 Defendants next lament the fact that denying them qualified immunity will allow Hudson "to use a colorable First Amendment statement to shield her from any and all future personnel actions." (Defs' Brief p. 27). Our decision does nothing to further that result. Rather, as McMurphy illustrates, the propriety of Hudson's discharge centers on the factual question of whether the defendants had proper motives for their action. In order to establish a prima facie First Amendment violation, Hudson msut demonstrate that her protected conduct motivated the defendants' action. See Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). As the issue of defendants' intent is not before us in this interlocutory appeal of the trial court's denial of qualified immunity, we need not consider it further.
 
 
 21
 AFFIRMED.