72 F.3d 130
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Karl A. SCHLEDWITZ, Defendant-Appellant.
 Nos. 95-5309, 95-5409.
 United States Court of Appeals, Sixth Circuit.
 Dec. 4, 1995.
 
 Before: CONTIE, MILBURN, NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 In these consolidated appeals, defendant, Karl A. Schledwitz, who has been convicted on three counts of mail fraud pursuant to 18 U.S.C. Secs. 1341 and 1342, appeals the district court's denial of his Federal Rule of Criminal Procedure ("Fed.R.Crim.P.") 33 motion for a new trial based on newly discovered evidence (No. 95-5309) and the denial of his motion for reconsideration (No. 95-5409). For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 Defendant Karl A. Schledwitz was an attorney in Memphis, Tennessee, who had several financial dealings with Jacob F. "Jake" Butcher and C.H. Butcher, two brothers who ran a banking empire in Tennessee and Kentucky. The Butchers controlled at least twenty-five financial institutions and used the banks' money as their own. Schledwitz was accused by the government of being a "player" in the Butcher banking empire, from September of 1979 to March of 1983, by allowing his name to be used to borrow money from the Butcher banks when the money was actually used to personally benefit the Butchers. In return, Schledwitz would allegedly receive business for his law practice and loans for his own businesses. In total, the various Butcher banks loaned more than $1.5 million in Schledwitz's name. These often unsecured loans were provided to Schledwitz at a time when he did not have the personal income to justify such loans. When the Butcher banks failed, Schledwitz owed over $2 million in principal and interest, but he settled with the government by agreeing to repay only $120,000.
 
 
 3
 On January 21, 1992, defendant Schledwitz was charged in an indictment in the Eastern District of Tennessee with eight counts of mail fraud, in violation of 18 U.S.C. Secs. 1341 and 1342, in relation to financial loans made to Schledwitz by banking institutions affiliated with Jake and C.H. Butcher. Schledwitz was alleged to have been involved in two mail fraud schemes. The first scheme related to a scheme to defraud the banks controlled by the Butchers, while the second scheme related to a scheme to defraud the successors in interests to those banks. At the trial, the district court granted a partial judgment of acquittal, dismissing counts four through eight of the indictment relating to the second scheme as there was no evidence that Schledwitz could have paid any more than he did to the successors in interest. As to counts one through three, the mail fraud charged in count one concerned several loans to Schledwitz to purchase United American Bank ("UAB") stock in banks controlled by Jake Butcher. Four banks controlled by Jake Butcher were involved: First and Farmers of Somerset, Kentucky; UAB of Memphis; UAB of Knoxville; and UAB of Hamilton County. The mail fraud charged in counts two and three concerned transactions with C.H. Butcher and his banks.
 
 
 4
 At the trial, the prosecution produced evidence of Jake Butcher's scheme to create a market for bank stock in his banks and to make loans in furtherance of this scheme and in furtherance of Jake and C.H. Butcher's personal and political interests. As an alleged "player" in this scheme, the prosecution showed at the trial how Schledwitz received numerous loans from the Butcher banks when his income did not justify the loans.
 
 
 5
 With regard to the Jake Butcher loans involved in count one, Schledwitz borrowed approximately $450,000 to buy UAB of Knoxville stock at a time when his total annual income was $34,313. An associate of Jake Butcher's, Jesse Barr, testified at the trial that Jake asked Schledwitz to buy the UAB of Knoxville stock. Barr claimed he arranged for two loans to finance Schledwitz's stock purchases and that Schledwitz would provide Barr with numerous blank notes and blank personal checks so Barr could make the interest payments for him. One loan for $120,000 was from the Somerset bank and was later transferred to UAB of Knoxville. A second loan for $300,000 was from UAB of Memphis and was later transferred to UAB of Hamilton County. By shifting the funds to different banks, the loans appeared current and were less suspicious to bank examiners. These transactions were allegedly part of Jake Butcher's plan to create a market for the stock in UAB of Knoxville by having his friends buy UAB of Knoxville stock with loans from other Butcher banks so Butcher could sell the Knoxville bank at a higher price. Barr also testified that a large portion of the loan proceeds from Schledwitz's loans either went directly to Jake Butcher or were used to pay Butcher's bills.
 
 
 6
 The mail fraud charged in count one of the indictment occurred when Schledwitz wrote a letter to Barr on October 9, 1981, telling Barr that an interest payment was due on a note at UAB of Hamilton County and asking what he should do to pay it. The bank sent Barr a renewal note on Schledwitz's loan since Barr was handling the note for Schledwitz. Counts two and three of the indictment charge similar transactions involving C.H. Butcher in which loans were made to Schledwitz but used to pay off C.H. Butcher's gambling debt at a casino in Las Vegas. On September 24, 1992, the jury convicted Schledwitz on these three counts of mail fraud. In an unpublished opinion, we affirmed Schledwitz's conviction. See United States v. Schledwitz, 14 F.3d 603 (6th Cir.1993) (unpublished per curiam), cert. denied, 114 S.Ct. 2679 (1994). Schledwitz was sentenced to six months in a halfway house.
 
 B.
 
 7
 Prior to the trial, defendant Schledwitz requested that the prosecution provide him with exculpatory evidence in compliance with Brady v. Maryland, 373 U.S. 83 (1963). Specifically, defendant requested
 
 
 8
 [a]ny prior testimony, which tends to exculpate the defendant, made to the department of Justice, the United States Attorney's office, the FDIC, other federal agencies, and/or the Grand Jury by the following individuals:
 
 
 9
 ... Jacob H. "Jake" Butcher.
 
 
 10
 J.A. 37. In response, the prosecution affirmed that it had complied with its Brady obligations and had supplied defendant with all evidence subject to Brady. However, on August 17, 1994, Schledwitz filed a motion for a new trial pursuant to Fed.R.Crim.P. 33 based on newly discovered evidence, information given to the defense by Jake Butcher's lawyer, William Ramsey, that, prior to Schledwitz's trial, Jake Butcher had been interviewed by agents from the Federal Bureau of Investigation ("FBI") concerning Schledwitz.[1] Ramsey remembered that Jake Butcher had made several exculpatory statements concerning Schledwitz and that these comments seemed to displease the government agents. In his motion for a new trial, defendant requested that the prosecution disclose this information. The prosecution responded to the motion by assuring the district court that the report from the Butcher interview had been supplied to defendant in conjunction with a separate prosecution in Memphis of Schledwitz.[2] However, Schledwitz's attorneys for the Memphis trial issued affidavits denying any knowledge of such an interview. The district court found that there was no dispute that the report relating to the interview was not produced in the trial in the Eastern District, assumed that it was not produced at the Memphis trial, and then ordered the production of documents relating to the 1985 interview.[3]
 
 
 11
 Complying with the district court's order, the prosecution produced a thirteen-page FBI 302 report of an interview with Jake Butcher by agents from the FBI and Internal Revenue Service ("IRS") on October 29, 1985, at the Federal Prison Camp in Atlanta, Georgia. In that interview, Butcher was questioned extensively about Schledwitz's involvement with Butcher and his banks. The FBI 302 report reveals that Butcher told the agents that he had approached Schledwitz as a friend to offer him some bank stock that some of Butcher's other friends wanted to sell. Although Butcher admitted that he frequently assisted others in financing purchases of stock from his bank, Butcher could not remember whether he arranged financing for Schledwitz. The report further shows that Butcher stated that Schledwitz did not hold bank stock as a "trustee" for him, that he never told Schledwitz he would take care of interest payments on the loans, and that he never directed people to Schledwitz's law practice.
 
 
 12
 In addition to the substantive statements of Jake Butcher, the FBI 302 report revealed that Jay Horne was one of the IRS agents present at the interview. At the trial, Horne was the prosecution's only expert witness, and he was presented as a neutral advisor who had been hired by the government to trace Schledwitz's financial records. No mention was ever made by the prosecution of Horne's role in the investigation of Schledwitz in 1985.
 
 
 13
 On January 31, 1995, the district court denied defendant's motion for a new trial based on the newly discovered FBI 302 report, holding that,
 
 
 14
 Mr. Butcher's opinion, if not the existence of the FBI 302 report, could have been discovered prior to trial with due diligence; that the evidence, although relevant, is merely cumulative and would not have impeached a government witness: and that it is unlikely that, if the jury had known that Jake Butcher did not consider Mr. Schledwitz a "nominee," they would have acquitted him.
 
 
 15
 J.A. 331-32. On February 10, 1995, defendant filed a timely notice of appeal of the denial of his new trial motion in Case No. 94-5309.
 
 
 16
 Also on February 10, 1995, defendant made a motion for reconsideration of the denial of his new trial motion. In making his motion for reconsideration, the defendant presented an affidavit from Jake Butcher, who did not testify at Schledwitz's trial, stating that although he was interviewed by one of Schledwitz's attorneys in 1992 prior to the trial, he did not disclose the existence of the 1985 interview because he did not recall it. The defense also presented an affidavit from Schledwitz's trial attorney, W. Thomas Dillard, detailing how the FBI 302 report would have altered defense strategy. On February 23, 1995, the district court denied defendant's motion for reconsideration. Schledwitz filed a notice of appeal pertaining to the denial of his motion for reconsideration on March 9, 1995. Since that appeal was untimely,[4] a show cause order was issued directing Schledwitz to show cause why his appeal should not be dismissed for lack of jurisdiction. By an order of May 10, 1995, the district court allowed the defendant an enlargement of time to file his appeal, rendering the March 9, 1995, appeal in Case No. 94-5409 timely. These appeals were then consolidated.
 
 II.
 A.
 
 17
 Defendant Schledwitz argues that the district court applied an incorrect legal standard and erred in denying his motion for a new trial based on newly discovered evidence since the newly discovered evidence was evidence suppressed by the prosecution in violation of Brady v. Maryland, 373 U.S. 83 (1963). "Motions for a new trial based on newly discovered evidence are disfavored," and we will not reverse the denial of a new trial motion unless there is " 'clear abuse of discretion' " United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986) (quoting United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984) (per curiam)), cert. denied., 484 U.S. 859 (1987).
 
 
 18
 The district court denied defendant's new trial motion based on the four part test for new trial motions articulated by this court in O'Dell:
 
 
 19
 (1) the new evidence was discovered after the trial;
 
 
 20
 (2) the evidence could not have been discovered earlier with due diligence;
 
 
 21
 (3) the evidence is material and not merely cumulative or impeaching; and
 
 
 22
 (4) the evidence would likely produce an acquittal.
 
 
 23
 O'Dell, 805 F.2d at 640 (quoting United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982)). However, we held in O'Dell, pursuant to Brady v. Maryland and its progeny, that the four part test is altered when the new trial motion involves material suppressed by the prosecution. O'Dell, 805 F.2d at 641. When the new trial motion is based on evidence specifically requested by the defendant but withheld by the prosecution, the standard becomes whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); id. at 685 (White, J., concurring)).
 
 
 24
 In the present case, defendant Schledwitz presents new evidence which he specifically requested from the prosecution but was not given. Only after the trial did defendant learn of the FBI 302 report of the interview with Jake Butcher in 1985. This FBI 302 report is favorable to Schledwitz since in that interview Butcher denies Schledwitz's role as his "trustee" and denies taking care of Schledwitz's interest payments. Therefore, this new evidence should be analyzed under the Bagley materiality standard requiring a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" rather than the four part Barlow standard requiring a likelihood of acquittal. Since the district court applied the much stricter Barlow standard in denying defendant's new trial motion, it erred as a matter of law.
 
 
 25
 In Brady, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. For a constitutional violation to occur, the evidence suppressed by the prosecution must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108 (1976). Recently, the Supreme Court has expounded on the meaning of the Bagley materiality standard for determining when the prosecution commits a constitutional violation in suppressing evidence. In Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995), the Court held that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Nor is the Bagley materiality test a sufficiency of the evidence test requiring the defendant "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 115 S.Ct. at 1566. Further, a Brady violation can never be harmless error. Id. The Court also noted that the Bagley analysis is not applied "item-by-item" but is applied collectively to all of the suppressed evidence. Id. at 1567.
 
 
 26
 Defendant Schledwitz argues that the FBI 302 report detailing the interview with Jake Butcher is material evidence under the Bagley standard. In making his argument, defendant presents two ways in which the new evidence could have been used at trial. First, by cross-examining the prosecution's only expert witness, Jay Horne, the defense could show that Jake Butcher did not consider defendant to be his nominee and that Butcher denied taking care of defendant's interest payments on the loan. This substantive evidence, the defense argues, casts doubt on the allegations of mail fraud leveled at the defendant and, moreover, calls into question the reliability of the prosecution's case since they put Jesse Barr on the stand, because he testified in their favor, but refused to call Butcher as a witness because his testimony was exculpatory to Schledwitz.
 
 
 27
 Second, the defendant argues that the new evidence could be used to impeach Horne's testimony since he was present at the 1985 interview with Butcher. According to the defense, this shows Horne's bias against defendant since, as an IRS agent, he investigated the defendant and, thus, was not the disinterested expert witness he was portrayed as at the trial.
 
 
 28
 However, the United States argues that although the Bagley standard of materiality is the appropriate one to use, since the district court found that the new evidence was cumulative and not impeaching, there is no reasonable probability that the FBI 302 report could have altered the outcome of the trial. The United States also argues that the FBI 302 report should have been known to defendant if he had only exercised due diligence and, therefore, can not constitute Brady evidence.
 
 
 29
 It can hardly be argued by defendant that the statements made by Butcher meet the Bagley materiality test since the defendant had to be aware of Butcher's opinion contained in the FBI 302 report. The district court found that "Mr. Butcher was well known to be friendly and available as a witness [and] known to have testified that there was nothing illegal about Mr. Schledwitz's role in [his] banking maneuvers." J.A. 330. Indeed, defendant's counsel interviewed Butcher prior to the trial. Clearly, defendant's counsel could have called Jake Butcher to the stand at the trial to elicit his favorable statements, but they chose not to do so. Since defendant should have been aware of Butcher's opinions, the failure to provide defendant with the FBI 302 report is not a denial of a fair trial with regard to Butcher's substantive comments. See United States v. Todd, 920 F.2d 399, 405 (6th Cir.1990) (holding that there is no Brady violation when the defendant "was aware of the essential facts that would enable him to take advantage of the exculpatory evidence").
 
 
 30
 As to defendant's argument with respect to the impeaching value of the evidence in cross-examining Horne, we note that impeachment evidence can constitute Brady material. Bagley, 473 U.S. at 676. Without the FBI 302 report, defendant had no way of knowing of the existence of the 1985 interview with Butcher and Horne's role in it. Indeed, defendant requested all reports from any interviews with Jake Butcher and relied on the prosecution's representation that all reports had been produced. Thus, defendant could have attempted to impeach Horne's expert opinion by showing Horne was an IRS agent investigating Schledwitz in 1985. However, we conclude that this type of impeachment does not satisfy the Bagley materiality standard and, therefore, does not require the granting of defendant's motion for a new trial. The absence of this "impeaching evidence" from the trial does not "undermine[ ] confidence in the outcome of the trial" and does not "deprive[ ] the defendant of a fair trial." Id. at 677. Accordingly, although the decision of the district court to deny defendant's motion for a new trial was based on an incorrect legal standard, we will not reverse that decision since, under the correct standard, there is no reasonable probability that the outcome of the trial would have been different. See Helvering v. Gowran, 302 U.S. 238, 245 (1947) (permitting appellate courts to affirm a ruling which relied upon the wrong ground if the decision is correct).
 
 B.
 
 31
 Defendant Schledwitz also appealed the district court's denial of his motion for reconsideration of the denial of his motion for a new trial. Federal Rule of Appellate Procedure 28(a)(4) requires that appellant's brief "contain the contentions of the appellant on the issues presented." Since defendant did not raise any issue or make any argument challenging the district court's denial of his motion for reconsideration in his briefs on appeal, this issue is deemed waived. McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986).
 
 III.
 
 32
 For the reasons stated, the orders of the district court are AFFIRMED.
 
 
 
 [1]
 The motion also referred to C.H. Butcher's grand jury testimony, but the district court later concluded that that testimony was inculpatory and not discoverable since C.H. Butcher was not called as a witness at the trial
 
 
 [2]
 Schledwitz had been tried on other related charges as a co-defendant with Harold Ford in a 1990 Memphis trial
 
 
 [3]
 In their brief, the United States argues that defendant was aware of the existence of the FBI 302 report prior to the trial. However, the district court did not make this finding, and the weight of the evidence supports defendant's assertion that he did not know of the 1985 Butcher interview until after the trial
 
 
 [4]
 See United States v. Hatfield, 815 F.2d 1068, 1073-74 (6th Cir.1987) (requiring that notices of appeal from orders denying a motion for a new trial under Fed.R.Crim.P. 33 be filed within ten days from the docketing of the order being appealed)