995 F.2d 1066
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Paul HATFIELD, Fred McCoy, Plaintiffs-Appellees,
v.
Charles "Fuzzy" KEESEE, Defendant-Appellant.
 No. 92-5636.
 United States Court of Appeals, Sixth Circuit.
 June 8, 1993.
 
 Before: GUY and NELSON, Circuit Judges, and SPIEGEL, District Judge.[1]
 PER CURIAM.
 
 
 1
 This is an interlocutory appeal from an order denying a motion in which the defendant, a county sheriff, sought summary judgment on qualified immunity grounds. The defendant had discharged the plaintiffs from their jobs as deputy sheriffs three days after a press conference at which the plaintiffs made allegations of widespread corruption in the sheriff's department. The central question in the appeal is whether the undisputed facts show that a reasonable officer in the circumstances of the defendant sheriff would have thought he could fire the plaintiffs without violating their First Amendment rights. Concluding that this question must be answered in the negative, we shall affirm the denial of summary judgment.
 
 
 2
 * The defendant, Charles "Fuzzy" Keesee, was first elected sheriff of Pike County, Kentucky, in 1962. His service continued through 1989, the year in which the events at issue here occurred.
 
 
 3
 Plaintiff Paul Hatfield joined the Sheriff's Department as a salaried deputy on January 14, 1986. Plaintiff Fred McCoy was sworn in as a non-salaried deputy on January 30, 1986, and was moved to a salaried position on April 1, 1987. McCoy and Hatfield were both promoted to the position of investigator on March 1, 1988, and to the position of detective, the highest rank for a deputy sheriff in Pike County, on February 1, 1989. Their service was not devoid of complaints from the public. The complaints ranged from allegations of harassment to allegations of abusive behavior while making arrests.
 
 
 4
 Deputies McCoy and Hatfield observed practices in the Sheriff's Department that they characterize as corrupt and illegal. In November of 1987 they started expressing their concerns to Mark Putnam, a special agent of the Federal Bureau of Investigation. The meetings with Agent Putnam continued until 1989, when Putnam was transferred to Florida. The FBI did not replace him, and deputies Hatfield and McCoy decided at that point to go public with their accusations. They held a press conference in Lexington on August 7, 1989, where they aired their complaints at length. Deputy McCoy likened the department to a small mafia with Sheriff Keesee as the godfather.
 
 
 5
 The record does not contain a transcript of the press conference, but we do have deposition testimony from which it is possible to reconstruct many of the specific allegations that were made.[2] Sheriff Keesee has denied most of the accusations, at least to some degree. We shall describe the most important allegations and the sheriff's response to each.
 
 
 6
 The plaintiffs charged that Sheriff Keesee directed his deputies not to serve bench warrants on people with whom he had personal or political ties. Deputy Hatfield detailed seven instances in which the sheriff allegedly told him not to serve bench warrants.
 
 
 7
 Other deputies subsequently corroborated the plaintiffs' accusations about irregularities in serving warrants. Deputy Bill Scott testified that he was told to hold a warrant on James Dotson; Scott did not know whether the warrant was ever served. Deputy Mike Williamson likewise testified that he had been asked to hold warrants:
 
 
 8
 "Q: What about Fuzzy supposedly telling [Hatfield and McCoy] to hold warrants and not serve them, or telling any other deputies to hold warrants and not serve them? Have you ever been told to hold a warrant?
 
 
 9
 A: Oh yes....
 
 
 10
 Q: Okay, do you remember other than just generally there being some sort of a file for warrants to hold, any particular cases that either you had been told to hold a warrant, or someone else was told to hold a warrant?
 
 
 11
 A: There was so many that I just couldn't--"
 
 
 12
 Sheriff Keesee denied ever ordering that warrants be held or not served, and he testified that other personnel in his office generally handled service of warrants. Deputy James Hager testified that he had never been told to hold a warrant, and that he had no knowledge of deputies Hatfield and McCoy being told to do so.
 
 
 13
 Sheriff Keesee was accused of fixing drunken driving arrests for his friends. Deputy McCoy cited five situations in which the sheriff was said to have intervened personally in such cases. Sheriff Keesee's actions were said to have included instructing McCoy not to proceed on a drunken driving charge against a friend's son, ordering McCoy and another deputy to remove a drunken driving arrestee from jail and return him to his truck, and instructing McCoy not to appear in court when a drunken driving charge was to be adjudicated. Deputy Bill Scott later testified that he was aware of two instances in which deputies had been told to release DUI arrestees without charges.
 
 
 14
 Sheriff Keesee denied ever having taken care of any DUI cases or having instructed McCoy not to appear in court. He also noted that other deputies whom McCoy had said assisted him in certain of the arrests could not recall arresting the persons McCoy named.
 
 
 15
 Deputy Ronnie Williams was said to have received sexual favors from an arrestee named Brenda Dotson in exchange for tearing up her arrest warrant. When Hatfield and McCoy informed the sheriff of the allegation against Deputy Williams, he was said to have told them to take no action. When Ms. Dotson's husband came to Sheriff Keesee complaining of the deputy's action, the sheriff was said to have threatened him. The sheriff responded to these allegations with a statement by the Kentucky state trooper who accompanied Deputies Hatfield and McCoy when they interviewed Brenda Dotson. The trooper declared that "[t]he statement that Sheriff Charles 'Fuzzy' Keesee had the investigation of the rape stopped is not true."
 
 
 16
 Deputy Hatfield asserted that the sheriff stole a letter sent to him by a Mrs. Prater. The letter, which stated that Sheriff Keesee would not investigate the death of the writer's son, asked Hatfield and McCoy to investigate. Evidence submitted by the sheriff demonstrates that the Kentucky State Police investigated the son's death three times and found it to be accidental. Sheriff Keesee does not respond to the allegation that he stole the letter.
 
 
 17
 Several deputy sheriffs in the department had felony convictions, according to Hatfield and McCoy, or were charged with serious crimes while serving as deputies. Among them were Erse Justice (convicted of robbing a post office); Ronnie Williams (bribery); Dave Coleman (breaking and entering); Poyster Keene (bigamy); Harold "Boonie" Runyan (serving as deputy when charged with murder and bank robbery); and Bubby Phillips (serving as deputy when charged with delivering drugs in a sheriff's car). The sheriff responds that he was not aware of any of the felony convictions until they were made public by Hatfield and McCoy. After the allegations came to light, some of the deputies with felony convictions went through a procedure that allowed them to carry guns. However, two of the deputies who had indicated on their employment applications they had no felony convictions were allowed to continue working after the falsity of the applications was brought to light.
 
 
 18
 Hatfield and McCoy claimed that a homicide by a man named Happy Coleman was covered-up. The plaintiffs say that Deputy Melvin Salyers told them that Sheriff Keesee took Mr. Coleman to the county line and dropped him off following the homicide. In response, the sheriff presented evidence that Happy Coleman was convicted of reckless homicide in 1979.
 
 
 19
 Among other allegations made by the plaintiffs and denied by the defendant were these: that Sheriff Keesee acquiesced in the return of money, explosives, and guns to arrestees without determining whether those items were linked to illegal activity; that a deputy sheriff provided bail money to a man arrested on drug charges; that a high-ranking deputy told the plaintiffs to skim off a portion of drugs they seized to compensate a local car dealer who allowed the sheriff's office use of his cars to make undetected drug buys; and that another deputy operated an illegal poker machine in the Pond Creek area of Pike County.
 
 
 20
 Sheriff Keesee discharged both deputies three days after the press conference at which these charges were made. The sheriff cited "conduct calculated to disrupt the orderly and effective operation of the Pike County Sheriff Department" and the need to reduce expenditures due to budgetary constraints. The plaintiffs filed their original complaint on August 7, 1990. Relying on 42 U.S.C. § 1983 and the First Amendment, they sought reinstatement to their jobs and compensatory and punitive damages. An amended complaint filed a year later repeated the § 1983 claim and added state law claims for wrongful discharge and intentional infliction of emotional distress.
 
 
 21
 After a considerable amount of discovery had taken place, Sheriff Keesee moved for summary judgment. The district court (Hood, J.) denied the motion as to the § 1983 and state law wrongful discharge claims, but granted summary judgment for the defendant on the intentional infliction of emotional distress claim. The court specifically rejected a claim that Sheriff Keesee was entitled to summary judgment on qualified immunity grounds. The sheriff then perfected this appeal from the denial of qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (denial of qualified immunity is immediately appealable as a "final order" within the definition of 28 U.S.C. § 1291).
 
 II
 
 22
 The test for determining whether a state official is entitled to qualified immunity from liability remains that enunciated in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982): "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The applicability of the qualified immunity defense is a question of law. Gossman v. Allen, 950 F.2d 338, 341 (6th Cir.1991).
 
 
 23
 In public employee discharge cases based on alleged violations of the First Amendment, we use a "balancing test" in determining whether such violations have occurred. "A public employee's interest in commenting on matters of public concern is protected by the first amendment only insofar as it is of greater weight than the employer's interest in 'promoting the efficiency of the public services it performs through its employees.' " Guercio v. Brody, 911 F.2d 1179, 1183 (6th Cir.1990), cert. denied, 111 S.Ct. 1681 (1991), quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968).
 
 
 24
 The Supreme Court has identified a number of factors as relevant in this connection:
 
 
 25
 "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose.... We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 398 (1987).[3]
 
 
 26
 Perhaps the most important factor to be considered is the object of the speech. "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law...." Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir.1986). See also Solomon v. Royal Oak Township, 842 F.2d 862, 865-66 (6th Cir.1988), and the cases there cited. Solomon was published more than a year before plaintiffs Hatfield and McCoy were fired, and the opinion left little room for doubt as to the constitutional status of legitimate claims of public corruption:
 
 
 27
 "This Court has held that speech disclosing public corruption is a matter of public interest and therefore deserves constitutional protection. See McMurphy v. City of Flushing, 802 F.2d 191, 196 (6th Cir.1986) (obviously, the public is concerned with how a police department is operated, and efforts to give public exposure to alleged misconduct are protected); Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir.1986) (public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law)." Id. at 865.[4]
 
 
 28
 In Guercio v. Brody, we considered the plight of a bankruptcy judge's confidential secretary who had been fired, she claimed, because of her disclosure of corruption in the bankruptcy court and her dissemination of 20-year-old newspaper articles critical of the attorney nominated to replace the bankruptcy judge when the latter resigned as a result of the disclosures. Ms. Guercio brought suit against the bankruptcy judge and district court judge who had caused her dismissal, alleging a First Amendment violation. The judges asserted qualified immunity as an affirmative defense. We approached the issue in the following manner:
 
 
 29
 "Without concluding where [the Pickering ] balance ultimately comes to rest--a decision reserved for the trier of fact--this court must dispose of the motion to dismiss on the basis of qualified immunity ... by determining whether Guercio's rights under Pickering, as opposed to ... the general teachings of Pickering, were so clear at the time in question that reasonable minds could not differ on the constitutionality of her discharge." Guercio, 911 F.2d at 1184.
 
 
 30
 This court ultimately determined that the grant of qualified immunity was appropriate because "judges of reasonable competence" could have disagreed regarding "where the Pickering scale, with all of the parties' competing interests in the balance, would ultimately come to rest." Id. at 1189.
 
 
 31
 At issue in Gossman v. Allen was qualified immunity for the dismissal of a county health inspector. The inspector had openly criticized her superiors in various forums, including a hearing on the environmental impact of a proposed airport expansion and a federal enforcement action against a local waste water treatment plant. She also wrote (under a pseudonym) newspaper articles alleging corruption in the department. This court noted several material inconsistencies between the inspector's public statements and her deposition in the lawsuit. Based on these inconsistencies, the court determined that "a reasonable official could believe that Gossman had knowingly or recklessly made false statements to the media and to the court," so that qualified immunity for the defendants was appropriate. Id. at 343.
 
 
 32
 In Garvie v. Jackson, 845 F.2d 647 (6th Cir.1988), this court considered the case of a university professor whose appointment as department head was not renewed because of his criticisms of a dean's handling of professors' evaluation grievances. Qualified immunity was held to be proper because reasonable administrators could have concluded that the interest in maintaining authority and good working relationships outweighed the professor's speech interest.
 
 
 33
 Sheriff Keesee argues that he is entitled to qualified immunity because a reasonable officer in his position could have concluded that the plaintiffs had knowingly or recklessly made false statements to the media, as in Gossman, and because a reasonable officer could have concluded that the value of the plaintiffs' speech was outweighed by the discipline and morale problems it created in the Sheriff's Department, as in Garvie. We do not find this argument persuasive; the situation in the case at bar is clearly distinguishable from the situations presented in Gossman and Garvie.
 
 
 34
 In Gossman, as noted above, there were material inconsistencies between Ms. Gossman's public statements and her deposition testimony. The court was not forced to weigh Ms. Gossman's testimony against contradicting testimony from her superiors. Because Ms. Gossman effectively admitted that important parts of her public statements about the health department were false, it was not difficult for the court to determine that reasonable officials could have believed her public statements contained falsehoods. Here, by contrast, neither Hatfield nor McCoy has contradicted his own accusations of corruption in the Pike County Sheriff's Department; in their deposition testimony, indeed, each corroborated the allegations of the other almost completely. It is true that Sheriff Keesee has denied most of the plantiiffs' allegations, sometimes with supporting evidence in the form of statements by other deputy sheriffs. But other deputies have stepped forward to corroborate important accusations of impropriety, particularly with respect to questionable acts by Sheriff Keesee in connection with DUI arrests and the service of bench warrants. We cannot resolve factual disputes in summary judgment proceedings where each side has provided support for its version of the facts--and "in disposing of a qualified immunity motion, [we must] place the totality of the well-pleaded, non-conclusory allegations of the complaint on the Pickering scale...." Guercio v. Brody, 911 F.2d at 1183-84. Having done the latter here, we conclude that a reasonable officer could not believe that Deputies Hatfield and McCoy knowingly or recklessly made false statements to the media at their press conference.
 
 
 35
 We are not prepared to say in this case that a reasonable sheriff could believe that the value of the plaintiffs' speech was outweighed by considerations of departmental morale and discipline. As we have seen, the public interest is at its zenith when speech includes accusations of corruption involving a public official. Garvie, in contrast, involved much more parochial concerns associated with administrative oversight of a department of speech and theater. That case is simply not comparable to this one.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [2]
 In deposing both Mr. Hatfield and Mr. McCoy, Sheriff Keesee's attorney explored every allegation repeated in an August 8 Lexington Herald Leader article about the press conference. The plaintiffs attached the article as an exhibit to their response to Sheriff Keesee's motion for summary judgment, but the district court struck it as inadmissible hearsay
 
 
 [3]
 In Rankin, the court determined that a First Amendment violation had taken place when a county clerical employee was fired for remarking, upon hearing of the assassination attempt on President Reagan, "if they go for him again, I hope they get him."
 The Rankin decision also made it clear that the threshold question in applying Pickering's balancing test is whether the state employee's speech regards a matter of public concern. Rankin, 483 U.S. at 384-85. Speech disclosing public corruption does constitute a matter of public concern, so the plaintiffs meet this threshold. See McMurphy v. City of Flushing, 802 F.2d 191, 196 (6th Cir.1986).
 
 
 [4]
 The public interest in knowing whether a law enforcement organization is being operated in accordance with the law is greater, of course, than the public interest in knowing which of two presumably honest candidates is supported by a deputy sheriff in an election for sheriff. See Cagle v. Gilley, 957 F.2d 1347 (6th Cir.1992)